**UNITED STATES of America,**
**Appellee,**

v.

**George STOFSKY et al.,**
**Defendants-Appellants.**

**Nos. 4–7, Dockets 74–1860, 74–1869, 75–1247 and 75–1253.**

United States Court of Appeals, Second Circuit.

Argued Sept. 22, 1975.

Decided Nov. 7, 1975.

Elkan Abramowitz, New York City (Michael R. Sonberg, Weiss, Rosenthal Heller & Schwartzman, Paul K. Rooney, Elliot L. Evans, Rooney & Evans, New York City, of counsel), for appellants Stofsky and Gold.

Leonard B. Boudin, New York City (Eric M. Lieberman, Michael Krinsky, Rabinowitz, Boudin & Standard, Stephen Barasch, New York City, of counsel), for appellants Hoff and Lageoles.

John C. Sabetta, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., V. Thomas Fryman, Jr., Lawrence B. Pedowitz, John D. Gordan, III, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before LUMBARD, MANSFIELD and TIMBERS, Circuit Judges.

MANSFIELD, Circuit Judge:

Once again in the wake of the discovery that a government witness committed perjury at trial we are called upon to strike a fair balance between the need for both integrity and finality in criminal prosecutions. Because we conclude that the perjury in issue is not of such significance as to have unfairly tainted defendants' convictions and find no merit in appellants' other points on appeal, we affirm.

On June 21, 1973, a federal grand jury handed down an indictment naming appellants, all of whom are officers and employees of the Furriers Joint Council (the "Union"), a trade union representing New York fur workers. The indictment alleged a variety of offenses, the principal of which was a conspiracy to

demand and accept payments from employers and to conduct the Union's affairs through a pattern of racketeering in violation of 18 U.S.C. § 371 (Count 1) and the acceptance of payments of money from certain employers in violation of 29 U.S.C. § 186(b)[1] (Counts 2–22). In addition, Count 23 charged that defendants Stofsky and Gold, the Union's Manager and Organizer, respectively, had conducted the Union's affairs through a pattern of racketeering activities in violation of 18 U.S.C. §§ 1961(1)(B) and (C) and 1962(c).[2] Count 24 charged Stofsky and Gold with corruptly endeavoring to influence a grand jury witness in violation of 18 U.S.C. § 1503. In addition, Stofsky, Hoff and Gold were charged, each in two counts respectively, with attempting to evade federal income tax in violation of 26 U.S.C. § 7201 (Counts 25–27, 31–33). After a two-week trial the jury on February 27, 1974, found each defendant guilty on all counts[3] in which he was charged.

According to the government's theory, this seemingly wide range of transgressions actually resulted from one common enterprise: a series of arrangements entered into through a middleman whereby certain fur manufacturers[4] paid bribes through the middleman to the defendants during the period 1967–70 in return for permission to violate certain provisions of the collective bargaining agreement in force in the New York locale between their fur manufacturing firms and the Union. In particular, the Union contract contained provisions forbidding "contracting" and regulating "jobbing" practices whereby a union-shop manufacturer distributed fur skins to outside non-union production units for completion into merchantable garments. Faced with rising labor costs under the Union contract, some manufacturers sought to exploit the possibilities of employing cheaper, outside labor through use of the non-union contractors. The Union, on the other hand, maintained a surveillance system designed to detect any such violations and was authorized by the agreement to inspect the records of each union-shop manufacturer for the purpose of uncovering any such violations. A complaint by a Union agent charging a violation of the anticontracting provisions of the Union agreement could result in the imposition of heavy fines on the manufacturer or loss of protection against picketing or strikes.

To establish certain counts of the indictment (e. g., Counts 6–14, 18–22) the government relied principally on the testimony of one Jack Glasser,[5] a labor adjustor employed by the fur manufacturers association, Associated Fur Manufacturers, Inc. (the "Association"), which was substantially corroborated by other evidence, including testimony by fur

---

1. 29 U.S.C. § 186(b) reads:

   "It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section."

2. 18 U.S.C. § 1961(1)(B) provides a long listing of examples of federal racketeering activity. 18 U.S.C. § 1961(1)(C) specifically defines "racketeering activity" as "any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) . . . ." And 18 U.S.C. § 1962(c) prohibits any person employed or associated with an enterprise affecting interstate commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

3. Judge Pierce sentenced Stofsky to 3 years' imprisonment and fines totaling $13,000; Hoff to 3 years' imprisonment and fines totaling $11,000; Gold to 2 years' imprisonment and fines totaling $10,000; and Lageoles to 2 years' imprisonment, execution suspended, and fines totaling $2,000.

4. The government separately indicted four fur manufacturers for making such illegal payments in violation of 29 U.S.C. § 186(a). Three pleaded guilty and have been fined. The fourth manufacturer, Karl Schwartzbaum, was also fined following a jury verdict of guilty. We today affirm his conviction in a separate opinion.

5. The government granted Glasser transactional immunity for his part in these activities.

manufacturers, a union business agent and two attorneys who were brought into the picture by some of the defendants to assist in furnishing advice to Glasser after he had been discharged by the Association for misconduct and had come under investigation by the federal government. In support of other counts of the indictment (e. g., Counts 2–5, 16–17), the government offered the testimony of fur manufacturers regarding payments made by them directly to certain of the defendants for permission to engage in contracting without Union harassment. Since the principal issue raised on the appeal is the claim that Glasser's perjury tainted the convictions, it becomes important to keep his testimony and its relation to the other proof in perspective.

Because Glasser's duties as a labor adjustor for the fur manufacturers brought him in close contact with officials of the Union, he was in a unique position to act as a middleman in bribing Union officials to permit contracting. He testified that on different occasions during the period 1967–1970 he accepted monies from different fur manufacturers (Sam Sherman, Harry Hessel, Breslin Baker, Karl Schwartzbaum, Sol Cohen and Daniel Ginsberg) to arrange Union protection for their illegal contracting, part of which he kept and the balance of which he paid over to one or more of the four defendants. Following the payments the manufacturers who paid the monies received preferential treatment from the Union in its enforcement of the anti-contracting provisions of the collective bargaining agreement. On the rare occasions when a Union agent, apparently unaware of the illegal arrangement, filed a complaint charging contracting in violation of the agreement, the complaint was suppressed by the defendants or disposed of through imposition of a token fine.

Glasser's testimony was substantially corroborated by the testimony of one fur manufacturer, Daniel Ginsberg, to the effect that in 1969 he paid $1,000 to Glasser to secure Union permission to use contractors and that the Union agents thereafter discovered evidence of his contracting, Glasser advised that he would take the matter up with Hoff or Stofsky and "have it fixed," following which he heard nothing more about the matter. Harry Jaffee, a Union business agent, testified to receiving from Glasser 6 to 10 cash payments, each of $50 or more, for ignoring violations by two manufacturers (Schwartzbaum Furs and Chateau Creations, Inc.) of the Union agreements' anti-contracting provisions.

The arrangement between certain fur manufacturers and Glasser was terminated when the fur manufacturers association fired Glasser in 1970 after discovering that he had been used by these members as an instrument of corruption. As further evidence of the defendants' complicity the government offered Glasser's testimony that upon being asked in 1972 by an investigator of the New York Joint Strike Force, Detective Civitano, to submit to interrogation, Glasser immediately communicated with Hoff, who arranged for him to meet an attorney, Irving Anolik, Esq., who in turn agreed to represent Glasser for $2,000. Glasser also conferred with Stofsky, Hoff and Gold at the Hotel New Yorker, where they counseled him as to how he should handle himself during the interrogation. Following the interrogation he met again with Stofsky, Hoff and Gold at the Hotel Hilton in New York City, where he related to them his conversation with the Strike Force investigator. Glasser further testified that shortly thereafter he was again called for interrogation and served with a subpoena to appear before a federal grand jury. He again met with Stofsky and Gold who, through the Union's General Counsel, obtained an attorney named Arthur Hammer to represent him. According to Glasser, Stofsky advised him "not to tell . . . anything, to take the Fifth" and that he would facilitate Glasser's receipt of his industry pension. Harold Cammer, called as a witness by the government, confirmed that at Gold's request he had recommended Mr. Hammer

as an attorney to represent Glasser in the grand jury investigation.

Another fur manufacturer, William Stiel, testified to making payments of money directly to Gold in 1968 and 1969 for permission to engage in contracting. Daniel Grossman, a large scale fur manufacturer, testified to making arrangements in 1970 and 1971 with Gold and Stofsky for two payments per year of $6,000 each for continuation of Grossman's contracting activities, and to his direct payment of these amounts to Gold. During the period of the payoffs Grossman's firm was not subjected to any fines, picketing or strikes even though Gold inspected skins bearing Grossman's seal in the shop of a contractor, William Poulos, who also testified for the government.

The defense put in by all defendants was essentially the same—a denial that they had received any monies from any fur manufacturers, either directly or through intermediaries. Although the defendants did not seriously dispute Glasser's receipt of bribes from certain manufacturers, they contended that he never shared his bounty with them but must instead have retained the payments for himself. Lacking support for this theory other than their own denials, the defense on the first day of trial obtained by subpoena Glasser's 1972 income tax return, which revealed the receipts of over $6,000 in interest payments from deposits of roughly $120,000 in several savings banks. Upon cross-examination as to the source of the $120,000, Glasser testified falsely that most of the money had been acquired by his wife through inheritance some 20 years earlier. His wife, called by the government, corroborated this false story. Although the defendants, some six days before the end of the trial, obtained a transcript from one of the Glassers' savings accounts (The East New York Savings Bank) showing that the Glassers had made a series of deposits amounting to $38,156 during the years 1967–70, which cast doubt upon their testimony as to the source of the funds, the defense did not

exploit this evidence. Instead it resorted to probate records indicating that the estates of Mrs. Glasser's parents had yielded only a few thousand dollars. In this posture the issue was argued to the jury.

After trial, the Glassers' explanation regarding their bank accounts began to unravel. Drawing upon data derived from additional tax records that the government had provided to defense counsel some seven days before the completion of trial, the defense now discovered that during the period 1967–70 the Glassers had deposited a total of $61,-659.05, of which approximately $57,000 was in cash. Questioned by government prosecutors, the Glassers acknowledged the falsity of their previous trial testimony concerning the extent of their 1967–70 deposits, but Glasser reaffirmed his testimony concerning defendants' complicity in the payoff scheme. Indeed, Glasser now maintained that a substantial portion of the additional sums represented what he had retained as his share of further, previously undisclosed illegal payoffs from the manufacturers after paying part of these additional payments to the defendants. Accordingly, on May 31, 1974, Judge Pierce denied defendants' motion for a new trial, pointing out:

> "It is far too wide a leap in reason to assert that just because Glasser accumulated $57,000 in cash during the critical time period that, *a fortiori*, a jury hearing these facts could only conclude that he kept the whole of the mere $11,000 he said he gave the defendants."

Judge Pierce concluded that, in view of Glasser's explanation, which implicated the defendants even further in the illegal scheme, it appeared unlikely that the newly-discovered evidence would lead to a different verdict.

In the meantime, the government had commenced its own investigation into the Glassers' financial affairs. After interviewing Glasser and inspecting additional records, the prosecutors on September 12, 1974, informed defense counsel of further discrepancies in Glasser's

previous explanation of the source and size of his bank deposits, revealing that Glasser had deposited additional amounts over a longer period of time (1962–1973), and indicating that his dealings with fur manufacturers may have been broader and in larger amounts than he had previously testified. The defendants again moved for a new trial. Again Judge Pierce, on June 4, 1975, denied their motion. Defendants appeal from their convictions and from the denial of their motions for a new trial.

## DISCUSSION

■ At the threshold it must be recognized that in the interest of according finality to a jury's verdict, a motion for a new trial based upon previously-undiscovered evidence is ordinarily "not favored and should be granted only with great caution." *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.), *cert. denied*, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958); *United States v. Sposato*, 446 F.2d 779 (2d Cir. 1971). Indeed, the standard of review governing most instances of newly-discovered evidence, first enunciated in *Berry v. Georgia*, 10 Ga. 511, 527 (1851), and steadfastly adhered to for over a century, is that the new evidence will not entitle the defendant to a new trial unless "it would probably produce a different verdict." See *United States v. De Sapio*, 456 F.2d 644, 647 (2d Cir.), *cert. denied*, 406 U.S. 933, 92 S.Ct. 1776, 32 L.Ed.2d 135 (1972); *United States v. Polisi*, 416 F.2d 573, 577 (2d Cir. 1969); 8A Moore's Federal Procedure § 33.04(1).

In two categories of cases, however, courts have deviated from this "probability" test and permitted new trials based upon a less exacting demonstration of the new evidence's materiality to the defendant's conviction. One line of cases looks to the existence of prosecutorial culpability in suppressing or failing to disclose the evidence in question; the other turns upon a witness's commission of perjury. As might be anticipated, appellants strive vigorously to fit their case within both categories.

### 1. *Governmental Culpability.*

■ The intentional governmental suppression of evidence useful to the defense at trial will mandate a virtual automatic reversal of a criminal conviction. See, e. g., *Moore v. Illinois*, 408 U.S. 786, 797–98, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *United States v. Sperling*, 506 F.2d 1323, 1333 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). This clearly is not such a case, however, as all parties agree that the government had no actual knowledge of the falsity of Glasser's trial testimony.

■ Appellants argue, however, that the prosecuting attorneys acted negligently in failing to probe more deeply into Glasser's financial affairs. The inadvertent but negligent failure on the part of a prosecutor to furnish to the defense evidence in the prosecutor's control that is of an exculpatory or impeaching nature would loosen the standard of review relative to newly-discovered evidence and require a reversal if "there was a significant chance that this added item . . . could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975); *United States v. Kahn*, 472 F.2d 272, 287 (2d Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); *United States v. Miller*, 411 F.2d at 825 (2d Cir. 1969). Furthermore, negligent suppression on the part of the government would run afoul of its independent responsibilities arising under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), where the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused" violates due process "irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1197.

■ The government's attorney acknowledged at oral argument that the newly-discovered evidence of Glasser's fi-

nancial status might have proved useful to both sides at the February trial, offering to each strengths that might have been offset by countervailing weaknesses. But this hindsight appraisal does not dispose of the issue. Cf. *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968). We do not employ the omniscience of a Monday morning quarterback as the standard for determining what investigation should have been made by the government. Although a diligent prosecutor, in the interest of protecting himself against surprise on the part of his principal witness, might well have audited Glasser's finances before putting him on the stand, there was no obligation to do so, since the government, in February 1974, did not have reason to believe that Glasser, blessed with transactional immunity, would have any incentive to engage in falsehoods concerning his own monetary affairs.[6] Indeed, although the government learned of the Glassers' 1972 federal tax return at the beginning of the trial, it did not have the facts with respect to the contents of the Glassers' savings bank deposits until the trial had been concluded.[7] Thus we cannot say that the government, prior to or during trial, acted unreasonably in failing to recognize the impeachment value of the Glassers' income tax records.[8]

The facts with respect to the defendant's own diligence in uncovering the newly-discovered evidence are materially different. It must be remembered that "a defendant seeking a new trial under any theory must satisfy the district court that the material asserted to be newly discovered is in fact such and could not with due diligence have been discovered before or, at the latest, at the trial." *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958). *Accord, United States v. Marquez*, 490 F.2d

---

**6.** As noted *supra*, trial commenced on February 11, 1974. The defense closed its case on February 26, and the jury announced its verdict on February 27. The Glassers' 1972 federal tax return was made available to defense counsel as of the first day of trial and the government distributed the remaining applicable tax returns on February 20. Defense counsel employed these returns in its cross-examination of Glasser on that same day. In addition, a defense subpoena *duces tecum* served on one of Glassers' savings banks resulted in the production on February 21 of a transcript listing Glasser's deposits during the years 1967–70. The defense did not offer this transcript into evidence during trial.

**7.** We are unpersuaded by appellants' contention that knowledge of the information in Glasser's returns on file with the Internal Revenue Service should under the circumstances of this case be imputed to the United States Attorney as a basis for declaring that he was negligent in failing to obtain and turn over these returns to the defense. Such a rule, which would obligate the prosecutor to anticipate Glasser's perjury with respect to the source of funds from which the income reported in the tax returns was derived, would be not only extremely burdensome but of doubtful utility. See *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir.), cert. denied, 404 U.S. 850, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971). Nothing in the tax returns was inconsistent with Glasser's receipt of the payoffs and sharing of them with the defendants. The 1967–70 tax returns of the Glassers' which the government distributed to defense counsel on February 20, see note 6 *supra*, merely declared additional interest payments from two different savings banks. Indeed defense counsel did not subpoena records of these accounts until April 10.

**8.** Appellants additionally contend that a looser standard relative to granting a new trial should be applied because the government was at fault in failing, while the first post-trial motion for a new trial was *sub judice*, to disclose that following the motion it had uncovered additional Glasser bank records indicating that the explanations given by Glasser regarding the source of his savings accounts were false. However, the government, having been misled by the earlier Glasser versions, obviously did not want to be accused of furnishing additional misleading records. Accordingly it decided to defer disclosure until it had obtained and confronted Glasser with the *entire* documentary picture, which it promptly assembled and, on September 3, 1974, notified the defense. Under the circumstances, including the fact that the completion of the trial had eliminated the emergency that would have existed if trial had been pending, we cannot label this conduct as deliberate or negligent nondisclosure calling for application of a different standard of review.

1383 (2d Cir. 1974), *aff'g on opinion below*, 363 F.Supp. 802, 803 (S.D.N.Y. 1973), *cert. denied*, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974); *United States v. Edwards*, 366 F.2d 853, 874 (2d Cir. 1966), *cert. denied*, 386 U.S. 919, 87 S.Ct. 882, 17 L.Ed.2d 790 (1967).

Here the transcript of the Glassers' account at the East New York Savings Bank, which had been subpoenaed by the defendants on February 13 and was available to them some 12 days before the end of trial, was actually delivered to them six days before the close of the defendant's own case. As Judge Pierce later noted this transcript "was strong evidence that Glasser was not telling the truth" with respect to Mrs. Glasser's inheritance. By recalling the witnesses to the stand, the defense could have used the transcript to recall and cross-examine the Glassers. If more time was needed to obtain additional information from the banks in question, the defense could at least have brought this predicament to the trial judge's attention and requested a continuance in order to exploit further this "strong evidence."

■ The failure to obtain and exploit the impeaching data until after the jury had rendered its verdict offers strong support for the government's contention that the defense did not exercise due diligence in obtaining the newly-discovered impeaching evidence in time for use at trial. However, the same charge does not lie against the government, for it, unlike the defense, did not during the trial have the East New York Savings Bank transcript in possession. We cannot, therefore, conclude that the government acted unreasonably in failing either to anticipate or prepare to rebut Glasser's perjury.

We conclude, then, that Glasser's perjury is not the product of governmental misconduct justifying application of the looser standards of post-trial review governing such cases.

2. *Glasser's Perjury.*

■ We turn then to the issue of whether Glasser's perjury itself requires a new trial. While the *Berry* "probability" standard discussed above generally governs challenges to a previous trial based upon newly-discovered evidence, a less stringent test has frequently been voiced in response to revelations of perjury. Under that test, which appears to have had its origin in *Larrison v. United States*, 24 F.2d 82, 87 (7th Cir. 1928), a new trial will be granted if, without the false testimony, the jury "might have reached a different conclusion."

Most circuits have expressed their allegiance to *Larrison*.[9] See generally, 8A Moore's Federal Practice §§ 33.04(1) & 33.06(1). In recent years, however, we have expressed increasing discomfort with the *Larrison* test in cases that do not involve prosecutorial misconduct, see, e.g., *United States v. Rosner*, 516 F.2d 269, 279 (2d Cir. 1975); *United States v. Marquez*, 363 F.Supp. 802, 806 (S.D.N.Y. 1973) (Weinfeld, *J.*), *aff'd on opinion below*, 490 F.2d 1383 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974); *United States v. De Sapio*, 435 F.2d 272, 286 n. 14 (2d Cir. 1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971). This trend no doubt reflects our realization that the test, if literally applied, should require reversal in cases of perjury with respect to even minor matters, especially in light of the standard jury instruction that upon finding that a witness had deliberately proffered false testimony in part, the jury

---

**9.** See, e.g., *United States v. Anderson*, 165 U.S. App.D.C. 390, 509 F.2d 312, 327 n.105 (1974) (dicta), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975); *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973) (government witness recanted testimony); *United States v. Meyers*, 484 F.2d 113, 116 (3d Cir. 1973) (applying *Larrison* to perjury by material witness); *United States v. Briola*, 465 F.2d 1018, 1022 (10th Cir. 1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973); *United States v. Curran*, 465 F.2d 260, 264 (7th Cir. 1972) (dicta); *United States v. Strauss*, 443 F.2d 986, 989 (1st Cir.), *cert. denied*, 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971); *United States v. Smith*, 433 F.2d 149, 151 (5th Cir. 1970).

may disregard his entire testimony. Thus, once it is shown that a material witness has intentionally lied with respect to any matter, it is difficult to deny that the jury, had it known of the lie, "might" have acquitted. We recognize that those who have professed adherence to the *Larrison* test do not appear to share our concern over the problems arising from its speculative nature. Indeed, notwithstanding the looseness of the test, most courts have not hesitated to deny new trials in cases where they have purported to apply it.[10] However, rather than adopt the *Larrison* test and violate it in application, we believe, for the reasons indicated, that the time-honored "probability" standard is the more appropriate one for determining whether perjury calls for a new trial. In addition to its other virtues the rule enables a court to act forthrightly in making its determination.

Defendants rely. heavily upon *Mesarosh v. United States*, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), in urging upon us a more lenient standard of review in cases where a new trial is sought on grounds of perjury. But this court has noted that *Mesarosh* is a *sui generis* case, *United States v. Zane*, 507 F.2d 346, 348 (2d Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1563, 43 L.Ed.2d 775 (1975), involving "that rare situation where a key witness . . . had been conceded by the government to have testified . . in such a bizarre fashion as to raise the inference that he was either an inveterate perjurer or a disordered mind." *United States v. Rosner, supra*, 516 F.2d at 279–80. Moreover, we are confident that such an incredible witness would not have survived the scrutiny of *any* standard of post-trial review, including a

proper application of the "probability" test endorsed by us.

Another problem that does not appear to have been the subject of explicit reported judicial consideration, at least in this circuit, is whether, in considering a motion for a new trial on grounds of perjury, the court should assume that the jury would have had before it the newly-discovered evidence not only for its probative value with respect to the issues but also to demonstrate that the witness had perjured himself with respect to that evidence, the latter being pertinent, of course, for its impeaching value. Put another way, should we, in determining whether truthful testimony by the witness would probably have changed the jury's verdict, also assume that the jury would have known that he had lied under oath about the matter? Since the witness's credibility could very well have been a factor of central importance to the jury, indeed every bit as important as the factual elements of the crime itself, see *Giglio v. United States, supra*, 405 U.S. at 154, 92 S.Ct. 763; *Napue v. Illinois, supra*, 360 U.S. at 269, 79 S.Ct. 1173; *United States v. Seijo, supra*, 514 F.2d at 1363–64, we would answer this question in the affirmative. Upon discovery of previous trial perjury by a government witness, the court should decide whether the jury probably would have altered its verdict if it had had the opportunity to appraise the impact of the newly-discovered evidence not only upon the factual elements of the government's case but also upon the credibility of the government's witness.

■ Applying the foregoing, we do not believe that the revelation of Glasser's perjury would have altered the

---

**10.** The decisions cited in note 9 *supra* reveal that frequently the courts circumvent the *Larrison* test by failing to recognize that the trial testimony was perjurious or had been recanted, see, e.g., *United States v. Johnson, supra*, 487 F.2d at 1279; *United States v. Strauss, supra*, 443 F.2d at 990, or by simply concluding that the *Larrison* standard remains unsatisfied. Thus, of the cases listed in note 9 in

which the courts expressed their adherence to *Larrison*, only one reversed a conviction based upon subsequently-discovered evidence, see *United States v. Meyers, supra*, and even in that case the court concluded that the perjury was so serious that it would have called for a retrial under *either Berry or Larrison*, 484 F.2d at 117.

jury's verdict. The new evidence of the Glassers' bloated bank accounts is not exculpatory in nature. Glasser's receipt of monies from at least six fur manufacturers was clearly established. It is a *non sequitur* to suggest that the discovery of Glasser's receipt of larger sums of money from some source establishes that he did not pass to defendants a share of what he concededly received from the fur manufacturers. The key factual issue in dispute—whether Glasser shared payments with the defendants— would not have been affected one way or the other by this new evidence. The newly-discovered bank records, furthermore, are too general in nature to permit substantiation of the defense's theory by tracing funds from the manufacturers' hands into Glasser's exclusive coffers.[11] Moreover, since Glasser now claims that the defendants also received their shares of these additional payoffs, it is doubtful whether defense counsel equipped with this new information, would find it beneficial to open the door to this evidence of possible further union corruption. Without necessarily assuming the trustworthiness of Glasser's posttrial explanation, which incriminated the defendants even further than did his trial testimony, the fact remains that, if the defense explored this territory, it would face the serious risk that a jury would be even less likely to discredit Glasser's testimony despite his earlier perjury. Although the revelation of his perjury would have impeached his credibility, this aspect of his testimony could be sensibly explained: despite the grant of immunity protecting him from criminal responsibility, he still was confronted with the risk that if he disclosed the true source of his hidden wealth to the government he would be subjected to civil income tax liability, which would deplete his resources as a retiree. Thus the impeaching value of the disclosure was of doubtful value to the defense as compared with the harm that might result to the defendants by Glasser's explanation.

In sum, balancing the potential damage to Glasser's credibility against the possibility that the new proof simply would be construed as evidence of a more widespread bribery scheme than previously recognized, we cannot say that disclosure of Glasser's perjury "probably" would have produced a different verdict.

### 3. *Miscellaneous.*

The melange of other contentions advanced by appellants fails to disclose any with sufficient merit to warrant reversal. We limit ourselves to those arguments upon which they appear to have placed their greatest reliance.

Appellants' first contention—that the indictments against them are invalid for the reason that they were handed down by the grand jury more than 18 months after it was originally impanelled— places the narrowest possible interpretation upon our previous rulings in *United States v. Fein*, 504 F.2d 1170 (2d Cir. 1974), and *Wax v. Motley*, 510 F.2d 318 (2d Cir. 1975). Appellants argue that the grand jury was convened pursuant to Rule 6, F.R.Cr.P., and therefore could not have been extended pursuant to the terms of the Organized Crime Control Act of 1970, 18 U.S.C. § 3331, beyond the 18-month term to which a Rule 6 grand jury is limited. We disagree.

■ The record amply supports the conclusion that this grand jury was impanelled pursuant to the Organized Crime Control Act of 1970, which permits an impanelled grand jury to be extended up to 36 months, and that it was lawfully extended beyond the date when the indictments were filed. Although the order of the late Chief Judge Sidney

---

11. At oral argument, it became clear that the dates of deposits and sums of money included on the newly-discovered bank statements cannot with any reasonable degree of precision be interrelated with the timing and size of payoffs flowing from the manufacturers to Glasser. Thus, the defense theory that Glasser retained all of the proceeds—obviously once rejected by the jury—still cannot be adequately substantiated.

248

Sugarman, which impanelled the grand jury, was facially ambiguous in that it did not expressly state that the grand jury was being impanelled pursuant to 18 U.S.C. § 3331, it did not refer to Rule 6 or contain the usual reference limiting the life of a Rule 6 grand jury to 18 months. The order was not obtained at the instance of the United States Attorney, which would be the case if the grand jury were convened pursuant to Rule 6, but upon the application of the Special Attorney of the Department of Justice who was then the Attorney-in-Charge of the New York Joint Strike Force on Organized Crime and Racketeering. Furthermore, when the grand jury, one month after Judge Sugarman's order, was convened, impanelled and sworn in by United States District Judge Dudley B. Bonsal, presiding for the district court, he expressly instructed the jury that it had been impanelled under the Organized Crime Control Act of 1970 and notified the grand jury that its term could be extended beyond 18 months for periods of 6 months up to a maximum of 36 months. He further informed the grand jury that it had additional powers not normally conferred upon grand juries. Thereafter the term of the grand jury was extended by orders of the district court beyond the 18-month period pursuant to 18 U.S.C. § 3331(a). It is clear that Judge Sugarman's order, viewed in context, was intended to and was issued pursuant to the terms of the Organized Crime Control Act of 1970.

Defendants' next contention—that the evidence showed a number of separate conspiracies rather than the one single conspiracy charged in the indictment—must likewise be rejected. The evidence established a continuous course of conduct in which a number of fur manufacturers, acting through Glasser as middleman, engaged in the corruption of the defendants as key members of the Union. Each of the defendants appreciated that the illegal arrange-

ments and payoffs to which he was a party were part of this ongoing scheme involving others. As responsible officials of the Union, appellants shared interrelated duties and worked closely together. Their participation over a period of time in the corrupt scheme was evidenced by numerous acts, including the joint approval by Stofsky and Gold of Grossman's violations of the Union agreement, the involvement of Hoff in the same violations, the association of each defendant with payoffs made by more than one fur manufacturer,[12] Gold's statements to Grossman indicating knowledge of payoffs by others, the joint determination of Hoff and Lageoles not to prosecute certain contracting complaints or to conduct the examination of certain fur manufacturers' books, and the efforts of Stofsky and Gold to induce Glasser not to give any harmful evidence when he came under federal investigation. Viewed in toto the evidence was more than sufficient to establish one single conspiracy. See, e.g., *United States v. Santana*, 503 F.2d 710 (2d Cir.), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 632 (1974); *United States v. Salazar*, 485 F.2d 1272 (2d Cir. 1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974); *United States v. Edwards, supra*, 366 F.2d at 867; *United States v. Agueci*, 310 F.2d 817 (2d Cir. 1962), *cert. denied*, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). Evidence regarding Glasser's payments to Jaffee, which were in furtherance of the conspiracy, was properly admitted, *United States v. Bynum*, 485 F.2d 490, 498 (2d Cir. 1973), *vacated and remanded on other grounds*, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), as was Glasser's testimony regarding fur manufacturers' overtures to enter the illegal payoff arrangements in exchange for permission to violate the Union agreement's contracting prohibition, see *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), *cert. denied sub nom. Lynch v. United States*, 397 U.S. 1028, 90 S.Ct. 1276, 25

12. Gold was shown to have received payoffs from six fur manufacturers, Hoff from four, Lageolis from two and Stofsky from one. Stofsky also authorized Grossman's violations and participated in the decision not to prosecute Ginsberg's firm.

L.Ed.2d 539 (1970); *United States v. Wiley*, 519 F.2d 1348 (2d Cir. 1975).

Appellants next object to the prosecutor's comments in summation to the effect that, although the fur manufacturers from whom Glasser testified that he had received payoffs had not been called by the government, they were available for subpoena by the defendants to testify at trial. Since the defense had opened the door in this regard by suggesting in summation, notwithstanding efforts by the prosecutor to obtain a directive that neither side be permitted to comment on the subject, that an inference adverse to the government might be drawn from the government's failure to introduce these witnesses, the prosecutor's argument was not improper. See *United States v. Deutsch*, 451 F.2d 98, 116–17 (2d Cir. 1971), *cert. denied*, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972). Nor was the government obligated to grant immunity to the fur manufacturers so that they could be called to testify. See *Morrison v. United States*, 124 U.S.App. D.C. 330, 365 F.2d 521, 524 (1966); *United States v. Bautista*, 509 F.2d 675, 677–78 (9th Cir. 1975).

The record discloses ample evidence of payoffs which, viewed in the light most favorable to the government, support the convictions of Stofsky, Hoff and Gold for income tax evasion in violation of 26 U.S.C. § 7201. The failure of the government to afford them an administrative conference with the IRS before indictment did not nullify the grand jury's actions. The grand jury's broad powers to investigate and to indict on the basis of evidence which disclosed reasonable grounds for belief that the defendants violated 26 U.S.C. § 7201, are not conditioned upon the taxpayers being given an opportunity to explain their conduct to a government official any more than to the grand jury itself. See *United States v. Daly*, 481 F.2d 28, 30–31 (8th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973); *United States v. Goldstein*, 342 F.Supp. 661 (E.D.N.Y.1972). Furthermore, the IRS regulation providing for such administrative conferences, 26 C.F.R. § 601.-107(b)(2), was not in effect at the time of the filing of the indictment.

Similarly a sufficient evidentiary basis existed to support the convictions of Stofsky and Gold for obstruction of justice in violation of 18 U.S.C. § 1503. Their conduct went beyond merely suggesting to Glasser that he had the right to invoke the Fifth Amendment. The trial judge, furthermore, instructed the jury that such advice would be insufficient to provide the necessary corrupt intent. In addition, the evidence established a concerted effort corruptly to persuade Glasser to remain silent in order to conceal the conspiracy and the payoffs. This proof was plainly sufficient. See *United States v. Cioffi*, 493 F.2d 1111, 1118–19 (2d Cir.), *cert. denied*, 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974).

We have examined the other grounds urged by appellants for reversal and find them meritless.

The convictions are affirmed.