Robert MORGAN, Plaintiff-Appellant,

v.

Dominick SALAMACK, Edgecomb Correctional Facility, and Robert Abrams, Attorney General for the State of New York, Defendants-Appellees.

No. 965, Docket 83–2245.

United States Court of Appeals, Second Circuit.

Argued April 5, 1984.

Decided May 18, 1984.

Andrew M. Lawler, New York City (Maurice M. McDermott, New York City, of counsel), for plaintiff-appellant.

Douglas D. Aronin, New York City, Asst. Atty. Gen. of the State of N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y., Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Arlene R. Silverman, Asst. Atty. Gen., New York City, of counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and POLLACK, District Judge.*

MILTON POLLACK, District Judge:

This is an appeal from an order denying an application to set aside a state court conviction for robbery on the basis of evidence discovered after the trial which showed that the prosecution's principal witness had testified falsely when he was asked by the prosecutor whether he had ever been arrested and whether he had a permit to carry a weapon in New York City. The claim is that the prosecutor should be faulted for having failed to inform himself on those matters before placing the witness on the stand.

Appellant was convicted by a jury in Supreme Court, Queens County (New York Penal Law § 160.15), and sentenced to an indeterminate term of imprisonment not exceeding four years for the robbery of a Rolex watch. The facts follow.

---

* The Hon. Milton Pollack, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

The charges stemmed from an incident which occurred on February 7, 1978 involving complainant, Alfred Teo, the appellant, and his two companions. The People's case was that Teo was attacked and robbed by appellant and his two accomplices while returning home from his job. He was driving down a public thoroughfare in his van, accompanied by a friend, when a heavy object was thrown through the left side window of the van, and he stopped to investigate. He got out, and was attacked and beaten by the appellant, and his companions, who stole his watch and attempted to steal his wallet. During the course of a struggle with the defendants, Teo suffered extensive injuries which sent him to the hospital.

Teo immediately drove to the nearby police station and registered a complaint, and within the hour the assailants were found and taken into custody, and they were thereafter indicted for robbery.

The defense contended that the appellant and his accomplices had not robbed Teo and that Teo had provoked their attack by brandishing a gun during a dispute about his near-accident involving Teo's van.

At the trial, the appellant's attorney, in his opening statement to the jury, forecast the appellant's proof with, "You are going to hear testimony that this innocent victim had a pistol permit—a pistol was there. It just so happens the man has a pistol permit for a .22 caliber ... he had a .22 caliber pistol," and, referring to the appellant, he added, "you will hear him [appellant] testify how he knows it was a .22."

The opening statements were concluded during the morning. At the start of the afternoon session, and just before Teo took the witness stand, the attorney for another of the three defendants told the Judge,

There is one further thing, Judge. There has been reference to whether in fact the complainant, Mr. Teo in this matter, is in possession of the pistol license—license or permit.... I would suggest that the possession of the pistol license permit by this complainant be *Brady* material to the defendants, in casting some credibility on the statements that they had made to that time, and if the District Attorney's office is in possession of it, that we be afforded a copy of it.

Prior to trial, the prosecutor had not made any inquiry for, or known of, the pistol permit held by Teo. But, having been alerted by the opening statements of the defense counsel, he sent out for information concerning permits held by Teo to possess a weapon. He responded to counsel's inquiry with, "I have a copy of it. I just got it at 1:30 this afternoon." Teo was then sworn as a witness, and, after identifying himself, was asked whether he had ever been held up, and he responded, "Twice," and whether he had a permit for a pistol and owned pistols. He testified that he had a .38 and a .357 magnum, but did not own, and never owned, any .22 caliber guns. He also testified that he had a permit for the weapons, and two licenses were produced and marked in evidence, he having handed them to the prosecutor during the noon recess, and both of these had a picture of himself on the license. One of the permits was to carry a gun for target practice, and he also had a permit for carrying a weapon around. In two brief questions from the prosecutor, Teo testified that he had never been convicted of a crime and had never been arrested. In fact, as appellant learned after the trial, from records of the Police Department, Teo had not been convicted of any crime, but in 1976 had been arrested, but the charge was dismissed.

On cross-examination, Teo explained that he had been employed in a restaurant, and in 1974 a carrying permit for New York State was issued to him in Westchester County in connection with that occupation. That permit, which was received in evidence, states that it is good until it is revoked, and appeared to be still valid and not expired, but reads, "Carrying for present employment only," but not for target shooting. Teo testified further on cross-examination that in 1978 he sought to have the permit amended to carry the gun in New York City, but that he never went

to the License Division to pick up the amended permit. Appellant's counsel then inquired whether since January 1, 1978 when he applied to have the permit amended, Teo ever carried a weapon on his person, and Teo responded, "No."

Q. And the reason that you don't is because your permit doesn't permit you to do that, isn't that correct?

A. You are right. And there is no reason for me to carry it.

Q. Doesn't your license also restrict you that when you do carry it, that the weapon must be unloaded?

A. Yes, that's what I always do.

Appellant's conviction for robbery was unanimously affirmed, without opinion, and leave for further appeal to the Court of Appeals was denied.

Subsequent to his conviction, appellant sought and obtained the records of the New York City Police Department regarding Teo's applications for gun permits and his arrest record. They showed that Teo had applied for a New York City carrying permit in 1978, but that the application was disapproved on grounds of "Insufficient need." The records also showed that the 1976 arrest on charges of reckless endangerment resulted in the suspension of his target permit, but that was subsequently restored when the complaint was dismissed. Finally, the records showed, that on January 25, 1979, some weeks before the commencement of the trial of the appellant, Teo received a summons for unlawful discharge of a firearm when he sought to frustrate an attempt to steal his automobile. This act resulted, after the trial of appellant was concluded, in suspension of Teo's target license.

Armed with information from the police files, appellant sought a new trial of his robbery conviction on the ground of posttrial discovery thereof. The State Court denied the motion in all respects. The Trial Judge noted that the information from the License Division was available to defendants in advance of the trial; and that the misstatement about being arrested was a collateral matter which related only to the credibility of the witness and not to the innocence of the appellant on the robbery charge. The Appellate Division denied leave to appeal.

Appellant then, under new aegis, brought the petition for a writ of habeas corpus in the District Court, alleging the falsity of Teo's statements on the witness stand and claiming that the prosecutor was chargeable with knowledge thereof, thereby depriving appellant of his constitutional right to a fair trial. Judge Platt conducted an evidentiary hearing at which the prosecutor was examined. The Judge denied the writ, and this appeal followed. The District Judge found, as a fact, that there was no misconduct by the prosecutor, intentional, negligent, or inadvertent; that the prosecutor had no knowledge of the arrest of Teo in 1976, or its circumstances, or of Teo's history with guns and gun permits. He found, moreover, that there was no basis for holding that the prosecutor should have known thereof, and further, that there was no reasonable likelihood that the newly discovered evidence could have resulted in an acquittal on the charge of robbery of the watch.

The District Court found that Teo's testimony regarding the robbery incident itself—the truthfulness of which is not directly questioned by the "new" evidence—was substantially corroborated by: (1) The testimony of Teo's business partner, who was nearby in Teo's van at the time of the incident; (2) the evidence of Teo's extensive injuries caused during the incident; and (3) the evidence that a police search of Teo, his partner, and his van on the night of the incident did not reveal a gun. In light of this corroboration and the other facts and circumstances in the case, the District Court concluded that "We do not believe that this newly discovered evidence probably would have resulted in acquittal if it had been presented at petitioner's trial," and Judge Platt denied the application.

Teo's testimony, taken in context, even if it contained false statements on collateral matters, did not occasion any violation by the prosecutor of appellant's constitutional rights, or impugn the fairness of the trial.

■ The relevant rule governing prosecutorial duties with respect to evidence which could be of help to a defendant is now well established by the Supreme Court's decision in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and has been applied in innumerable instances in this Circuit. *See, e.g., Perkins v. LeFevre*, 691 F.2d 616 (2d Cir.1982). None of the criteria which would fault a prosecutor's conduct are present here. The evidence in question, which was not probative of appellant's innocence, was not in the prosecutor's file; nor was he obliged to seek it out or check the complainant's background for the indictment that he was prosecuting—it did not seem to the prosecutor to be particularly important for his case.

■ A prosecutor is not constitutionally obligated to obtain information *dehors* his files for the purpose of discovering information which defense counsel can use in impeaching the credibility of a prosecution witness. His omission to do so does not place him at the risk of being charged with unfairness of the trial; such failure to make a check does not amount to denial of due process in the constitutional sense. Particularly is this true where, as here, the evidence is equally available to the defense, which chose not to investigate before the trial the public sources thereof.

■ *Agurs,* a case which elaborated on the obligations imposed on the prosecution under the *Brady* doctrine, addressed the due process issues which are implicated whenever there is a "discovery after trial of information which had been *known to the prosecution,* but unknown to the defense." 427 U.S. at 103, 96 S.Ct. at 2397 (emphasis added). While it is true that the good or bad faith of a prosecutor is not necessarily relevant to determining when the relaxed standard of materiality is to be applied, *Agurs,* 427 U.S. at 110, 96 S.Ct. at 2400, existing case law clearly reflects that the touchstone of the inquiry under *Agurs* is principally whether the prosecutor's office "possessed" the information in ques-

tion at the time of the trial. As stated in *Agurs,* the fact that "evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial." *Id.* at 111, 96 S.Ct. at 2401.

In *United States v. Hutcher*, 622 F.2d at 1083, 1088 (2d Cir.), *cert. denied* 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980), a federal defendant contended on appeal that the prosecution had failed to fulfill its *Brady* obligations by failing to make available prior affidavits and testimony of a prosecution witness which were inconsistent with the witness' trial testimony. The prior affidavits and testimony were located in a bankruptcy file which had been examined before the trial by investigators from the prosecutor's office. *Hutcher* rejected the appellant's claim on the ground that the prosecutor's lack of possession of the alleged *Brady* material by itself did not ground a constitutional complaint:

"Clearly the government cannot be required to produce that which it does not control and it never possessed or inspected." *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir.) cert. denied, 423 U.S. 1059 [96 S.Ct. 796, 46 L.Ed.2d 650], .... Hutcher argues that the prosecution did possess these materials because they must for some time have actually been in the hands of the prosecution's investigators.

We reject, however, a notion of "possession" which is so elastic as to embrace materials that the prosecution has never had in its files, never inspected, and never knew about. *Hutcher,* 622 F.2d at 1088.

In *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976), appellant sought the application of a more favorable materiality standard in a case in which a principal prosecution witness had perjured himself, notwithstanding that "all parties agree that the government had no actual knowledge of the falsity of [the wit-

ness'] trial testimony." The position of the *Stofsky* appellants was nearly identical to that propounded by petitioner: "that the prosecuting attorneys acted negligently in failing to probe more deeply into [the witness'] financial affairs." *Id.* at 243. The Court rejected this argument:

We do not employ the omniscience of a Monday morning quarterback as the standard for determining what investigation should have been made by the government. Although a diligent prosecutor, in the interest of protecting himself against surprise, might well have audited [the witness'] finances before putting him on the stand, there was no obligation to do so.... *Id.* at 244.

█ Assuming that the information discovered by petitioner after trial was *not* subject to a prosecutorial duty of discovery and disclosure imposed by *Brady* and *Agurs*, the correct standard for review, as a matter of due process, would appear to be no less favorable to the state than that actually applied by the District Court, namely: whether the newly discovered evidence "probably ... would have resulted in acquittal." *Agurs*, 427 U.S. at 111, 96 S.Ct. at 2401.

In considering the effect that appellants' new information would have had upon the jury's evaluation of his guilt, under either a strict or a relaxed materiality standard, it is relevant that: (1) because self-defense is not a defense to the crime of robbery, evidence suggesting that Teo had a gun at or prior to the time of the robbery incident can only bear on the question of Teo's credibility; (2) it is extremely doubtful that any extrinsic proof of the two collateral incidents in which Teo allegedly fired his gun would have been allowed at trial; and (3) as recognized by the District Court, the jury was presented with substantial corroboration of Teo's testimony on the substantive issue.

In short, there was no corruption of the truth-seeking process or injection of perju-

ry into the case by the prosecutor bearing on the innocence of appellant.

Affirmed.