**UNITED STATES of America, Appellee,**

**v.**

**Carluin SANCHEZ, Defendant–Appellant.**

**No. 749, Docket 93-1524.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 15, 1993.

Decided Sept. 9, 1994.

David Cooper, New York City, for defendant-appellant.

Sharon L. Davies, Asst. U.S. Atty., S.D.N.Y., New York City (Mary Jo White, U.S. Atty., Paul G. Gardephe, Asst. U.S. Atty., S.D.N.Y., of counsel), for appellee.

Before: FEINBERG, MINER, and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Defendant-appellant Carluin Sanchez ("Sanchez") appeals from a judgment entered June 30, 1993 in the United States District Court for the Southern District of New York, John S. Martin, Jr., *Judge*, that convicted Sanchez of: (1) conspiring to distribute heroin and to possess heroin with the intent to distribute it in violation of 21 U.S.C. § 846; and (2) possessing heroin with the intent to distribute it in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B), and 18 U.S.C. § 2. Sanchez was convicted after: (1) the jury returned a verdict of guilty on the two counts; (2) the district court granted a new trial pursuant to Fed.R.Crim.P. 33 because it concluded that the three police officers who testified on behalf of the government had

perjured themselves at trial; (3) on the government's appeal of the district court's order granting a new trial, we reversed and directed that judgment be entered on the jury's verdict, *see United States v. Sanchez,* 969 F.2d 1409 (2d Cir.1992) ("*Sanchez I* "); and (4) the district court entered judgment in accordance with our mandate and sentenced Sanchez principally to 151 months imprisonment.

In an opinion that preceded the imposition of sentence on remand, however, Judge Martin stated that but for our mandate in *Sanchez I* directing the entry of judgment on the jury's verdict, he would have granted Sanchez a new trial. *See United States v. Sanchez,* 813 F.Supp. 241 (S.D.N.Y.1993) ("*Sanchez II* "). First, Judge Martin would have reiterated his determination that the three police officers committed perjury, attributed that perjury to the prosecution even though the government attorneys prosecuting the case were unaware of it, and concluded that but for the perjured testimony, "the jury might, and I believe would, have reached a different result," mandating a new trial. *See id.* at 242–48 (quotation at 248). Second, he would have granted Sanchez's posttrial suppression motion (the "Suppression Motion"), which asserted that evidence recovered from Sanchez's apartment and subsequently introduced at trial should have been suppressed because the officers failed to knock and announce their purpose before entering his apartment in violation of 18 U.S.C. § 3109,[1] again requiring a new trial. *See id.* at 248–51.

On this appeal, Sanchez argues that the district court had the authority to order a new trial premised upon either the alleged perjury by the police officers or the Suppression Motion, despite the prior direction by this court in *Sanchez I* that judgment be entered in accordance with the jury's verdict. We conclude that the district court correctly determined that it had no authority to grant Sanchez a new trial. Sanchez also challenges

the district court's enhancement of his sentence for obstruction of justice. We affirm that ruling as well, and affirm the judgment of conviction.

## Background

The facts of this case have been extensively detailed in our prior opinion, *Sanchez I,* 969 F.2d at 1411–13, familiarity with which is assumed, and are recounted here only as necessary to elucidate the issues presented on this appeal. Sanchez was convicted for his role in a heroin distribution ring directed by Steven Ramos (the "Ramos Organization"). *Id.* at 1411. In the fall of 1990, Sanchez and his brother Hector "Tito" Sanchez ("Tito") moved to an apartment located on the second floor of 417 Thieriot Avenue in the Bronx (the "Apartment"). *Id.* at 1411–12.

On January 9, 1991, as part of an investigation of the Ramos Organization, twelve to fourteen law enforcement officers executed a search warrant for the Apartment.[2] *Id.* at 1412. At Sanchez's trial, three of the officers who executed the search at the Apartment, Sergeant Richard Bushrod and Detectives Joel Domenitz and Daniel Chin, all of the New York City Police Department, testified for the government. Bushrod testified on the government's direct case that during the execution of the warrant: (1) he knocked on the door to the Apartment; (2) the door was opened by Tito; (3) Bushrod identified himself as a police officer; (4) Tito attempted to close the door while Bushrod attempted to push his way into the Apartment; and (5) during the struggle with Tito, while the door was partially open, "Bushrod saw a person run across the room inside. He then heard a toilet flushing within the apartment." *Id.* Bushrod also testified that he remembered calling for a battering ram that the search team had brought to the site at some point during his attempt to enter the Apartment, but did not recall whether the ram was used to gain entry to the Apartment. *Id.*

1. Section 3109 provides:
    The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when

necessary to liberate himself or a person aiding him in the execution of the warrant.

2. The officers also had an arrest warrant for Tito, but not for Sanchez.

Domenitz testified on the government's direct case that: (1) as the officers approached the Apartment, they were yelling "police;" (2) Bushrod "banged" on the door, which was then opened by Tito; (3) "Tito immediately tried to close the door and got into a 'pushing match' with Bushrod, who then called for the ram;" (4) the door was rammed while it was partially open and was never fully closed after Tito opened it; and (5) during the struggle to gain entry, Domenitz observed "'a second male running from what turned out to be the bedroom into the bathroom.'" *Id.* (quoting trial testimony).

Chin testified on the government's rebuttal case that: (1) he used the battering ram to gain entry to the Apartment, and the door was closed when he hit it with the ram; (2) the door opened approximately six inches after the ram hit it and then slammed shut; (3) there followed a struggle between Tito on the inside and Bushrod and Chin on the outside; and (4) at a point in that struggle when the door was ajar, "Chin observed a person running across the room inside 'headed left to right towards the bathroom.'" *Id.* at 1412–13 (quoting trial testimony).

Domenitz testified that when the police gained entry to the Apartment, Sanchez was discovered emerging from the bathroom and arrested, and glassine envelopes containing heroin were discovered in the toilet. Nobody other than Tito and Sanchez was in the Apartment. *Id.* at 1415. The officers also found in the Apartment 480 glassine envelopes of heroin, a nine millimeter semi-automatic handgun, a beeper, and $46,000 in cash in a shopping bag. *Id.* at 1413.

The government's case against Sanchez consisted primarily of: (1) the heroin and other evidence recovered from the Apartment; (2) the previously detailed testimony of Bushrod, Domenitz, and Chin; (3) the testimony of Carlos Trinidad, a regular purchaser of heroin for resale from the Ramos Organization; and (4) intercepted phone conversations between Tito and Ramos that implicated Sanchez in the drug distribution network. *Id.* at 1411–13. Trinidad testified that: (1) he had purchased "thousands of dollars" of heroin for resale from Tito on a regular basis; (2) Sanchez had been present on a number of those occasions; (3) Sanchez had supplied Trinidad with heroin during a nine-day period in October 1990 when Tito was out of town; and (4) Trinidad had observed Sanchez on a number of occasions at, or arriving at, and on one occasion working at, "mills" where the Ramos Organization processed heroin. *Id.* at 1411. Trinidad's testimony, however, "was impeached by evidence of serious drug abuse, auditory hallucinations, inconsistent statements and the hope of reward for cooperation, all of which was brought to the jury's attention." *Id.* at 1413.

The jury returned a verdict of guilty against Sanchez on November 7, 1991. At a posttrial conference on November 20, 1991, the court indicated that, subject to being dissuaded by the government, it was inclined to grant both a motion for a new trial pursuant to Fed.R.Crim.P. 33 on the grounds that the testifying officers had perjured themselves, and the Suppression Motion, which had not yet been formally made.[3] The court further indicated its view that if it granted the motion for a new trial, there would be no need to decide the Suppression Motion at the same time. At a subsequent conference on November 22, 1991, the court again stated its inclination to grant the Rule 33 motion, but also indicated that if the Rule 33 motion were granted, it might be appropriate to address the Suppression Motion as well, so that any appeal by the government could resolve both issues.

On November 26, 1991, the district court ordered a new trial pursuant to Fed. R.Crim.P. 33, based upon its conclusions that: (1) the three law enforcement officers who had testified for the government had perjured themselves about "matter that was very much at the heart of the prosecution's case;" and (2) absent the officer's testimony, no jury would have convicted Sanchez based

---

3. Although the Suppression Motion was not formally filed until September 4, 1992, after our decision in *Sanchez I*, the motion was discussed by the court and the parties from November 4, 1991 onwards, when Sanchez's attorney, on the last day of trial testimony, expressed his intention to make the motion. This motion, both in its inchoate form and after it was formally made, will be referred to as the "Suppression Motion" in this opinion.

upon Trinidad's testimony, standing alone. Despite its previously expressed concern regarding the possibility of piecemeal appellate litigation, however, the court deferred consideration of the Suppression Motion.

The government took an appeal from the order granting a new trial, and as previously noted, this court concluded that the district court had abused its discretion in granting the new trial. *Sanchez I*, 969 F.2d at 1414. Further, we reversed and directed the district court to enter judgment in accordance with the jury's verdict. *Id.* at 1416.

Upon remand, however, the district court set a schedule for the filing of further motions, including, but not limited to, the Suppression Motion. Sanchez then moved to suppress the evidence seized from the Apartment, and for a new trial on the ground that the perjury by the police officers should be attributed to the prosecution, resulting in knowing prosecutorial use of perjured testimony.[4] Rejecting the government's objection that the Suppression Motion was untimely, the court subsequently conducted a suppression hearing and heard oral argument on the Suppression Motion. On February 10, 1993, the court ruled that "even though [it] believe[d] a new trial should be ordered because of both the knowing use of perjured testimony and the illegal search and seizure ..., [it was] compelled to deny [Sanchez's] motion and enter judgment" of conviction in light of our ruling in *Sanchez I*. *Sanchez II*, 813 F.Supp. at 251.

This appeal followed.

### Discussion

On this appeal, Sanchez argues that our prior decision in *Sanchez I* did not deprive the district court of the authority to grant either the Rule 33 motion or the Suppression Motion, and that his sentence was improperly enhanced for obstruction of justice. We address these arguments in turn.

### A. *Sanchez's Rule 33 Motion Based Upon the Officers' Alleged Perjury.*

■ "Where issues have been 'explicitly or implicitly decided on appeal,' the law-of-the-case doctrine obliges the district court on remand to follow the decision of the court of appeals." *Day v. Moscow*, 955 F.2d 807, 812 (2d Cir.) (quoting *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir.1991)) (collecting cases), *cert. denied*, —— U.S. ——, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992); *see also United States v. Minicone*, 26 F.3d 297, 300 (2d Cir.1994). Further, we will only reconsider a prior decision in the same case if there has been an intervening change in controlling law, there is new evidence, or a need is shown to correct a clear error of law or to prevent manifest injustice. *United States v. Adegbite*, 877 F.2d 174, 178 (2d Cir.), *cert. denied*, 493 U.S. 956, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989); *United States v. Yonkers Board of Education*, 856 F.2d 7, 11 (2d Cir.1988). Thus, the "strong policy favoring finality impels us to exercise the power to review [prior] rulings only sparingly." *Adegbite*, 877 F.2d at 178 (collecting cases).

The argument asserted on this appeal, that the perjury assertedly committed by Bushrod, Domenitz, and Chin should be attributed to the government and requires a new trial in the interests of justice, is foreclosed by *Sanchez I*. In that case, we expressly concluded that "the district judge erred in discounting the testimony of Sergeant Bushrod and Detectives Domenitz and Chin as perjured," 969 F.2d at 1414–15, and that "the trial judge was wrong to reject all the testimony of the three officers as perjured because of insignificant discrepancies and thereby to overrule the findings of the jury regarding credibility." *Id.* at 1415. These explicit rulings left no room for consideration on remand of any issue premised upon asserted perjury by the testifying officers, including the questions whether (1) such perjury should be attributed to the government, and (2) such attribution would compel a new trial.

The district court regarded these straightforward determinations in *Sanchez I* as dic-

---

4. Sanchez's motion also asserted that the government violated its disclosure obligations, but this contention is not relevant to this appeal.

tum, *see Sanchez II*, 813 F.Supp. at 245 n. 2, because this court went on to rule that even if the assertedly perjurious testimony were disregarded *in toto*, a new trial would not be appropriate. *See Sanchez I*, 969 F.2d at 1415–16. It is clear to us, however, that this latter discussion constituted an alternate holding, rather than dictum. In any event, as we have already observed, the law-of-the-case doctrine forecloses reconsideration on remand of issues that have been " 'explicitly or implicitly decided on appeal.' " *Moscow*, 955 F.2d at 812 (quoting *Uccio*, 940 F.2d at 758). This formulation precludes circumvention of an express ruling by this court, on remand, on the basis that the determination is not the "holding" of our appellate decision.

### B. *The Suppression Motion.*

■ Motions to suppress evidence are waived if not raised prior to trial, unless the court grants relief from the waiver "for cause shown." Fed.R.Crim.P. 12(b)(3) and (f); *see also United States v. Ulloa*, 882 F.2d 41, 43 (2d Cir.1989) (failure to make suppression motion prior to trial constitutes waiver). The Suppression Motion was first raised by Sanchez's counsel during trial, on November 4, 1991, and again renewed at the close of the defense case. The court acknowledged that the motion was late, but reserved decision and granted Sanchez leave to make the Suppression Motion after the trial was concluded. Subsequent to our remand with the direction to enter judgment in *Sanchez I*, the district court concluded that Sanchez had shown cause for his failure to raise the Suppression Motion prior to trial, held a suppression hearing, and concluded that the Suppression Motion should be granted. *Sanchez II*, 813 F.Supp. at 248–51. The district court ultimately ruled, however, that it had no authority to grant Sanchez any relief in view of our mandate in *Sanchez I*. *Id.* at 251.

As previously noted, *Sanchez I* remanded to the district court with the direction to enter judgment on the jury's verdict. 969 F.2d at 1416. Although the government appeal that culminated in *Sanchez I* did not bring the suppression issue before us for resolution, Sanchez's brief on appeal noted

that the issue was outstanding, and the government's reply brief responded that the issue had been waived. Further, a conference was held in the district court in the immediate aftermath of *Sanchez I*, prior to the submission of Sanchez's petition for rehearing to this court, at which the posttrial filing of the Suppression Motion was addressed. Nonetheless, no application was made in the petition for rehearing to modify our mandate to permit consideration of the Suppression Motion on remand.

Further, as Rule 12(f) plainly mandates, the district court was required to find "cause" for the failure to make the Suppression Motion prior to trial in order to consider it on remand. The court reasoned that "[w]hile ... defense counsel was aware prior to trial that grounds existed for a suppression motion, he did not have available an affiant or witness who could testify that the officers did not knock and announce their purpose." *Sanchez II*, 813 F.Supp. at 250. Tito was assertedly unwilling to testify at that juncture. Sanchez belatedly provided a one-page affidavit, at the suggestion of the district court (*see Sanchez II*, 813 F.Supp. at 248 n. 5), which stated that he was asleep until the police had battered down the door and gained access to the Apartment. It follows that he could not testify whether they knocked and announced their purpose before breaking through the Apartment door, as § 3109 requires. *See supra* note 1.

As the district court noted, however, "the evidence is clear that [Tito] was aware that [the police] were coming and was attempting to dispose of the evidence." *Sanchez II*, 813 F.Supp. at 250. Indeed, at a pretrial bail hearing, Sanchez's counsel represented to the district court in an *ex parte* side bar conference that Tito had heard car doors slamming when the police arrived, looked out the window and saw the police, and attempted to dispose of the heroin in the Apartment by flushing it down the toilet. It is also clear that the police used a battering ram to break down the outside door leading to the apartment building, and that a considerable number of police mounted the stairs from the ground floor to the Apartment. The scenario that Sanchez slept undisturbed through all

this tumult, and that Tito did not rouse Sanchez to advise him of the imminent arrival of the police or enlist his aid in disposing of the heroin before the police descended upon the Apartment, does not inspire confidence.

Finally, even assuming a failure to comply with § 3109, the gravity of any such failure is attenuated by the undisputed facts that: (1) Tito was admittedly aware of the identity of the morning visitors; (2) neither Tito nor Sanchez was undertaking to admit them; and (3) by all accounts, either Tito or Sanchez was busily engaged in destroying evidence while the police endeavored to gain entry to the Apartment.

In view of all the foregoing, we conclude that the district court abused its discretion by entertaining the Suppression Motion on remand, and decline to consider the merits of that motion on this appeal.

## C. *The Enhancement for Obstruction of Justice.*

■ Sanchez also challenges the district court's two-level enhancement of his offense level for obstruction of justice pursuant to USSG § 3C1.1, which provides:

> If the defendant wilfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

The commentary to this provision states that it applies, *inter alia,* to "threatening, intimidating, or otherwise unlawfully influencing a co-defendant ... [or] witness, ... or attempting to do so." *Id.,* comment. (n. 3(a)).

The district court enhanced Sanchez's sentence based upon a conversation between Sanchez and Marlene Ebanks in May 1991. Ebanks was a former participant in the Ramos Organization who had pled guilty to narcotics charges and entered into a cooperation agreement with the government. Ebanks testified on April 6, 1993, in a hearing conducted with respect to Sanchez's sentencing, that she had met Sanchez at "the Alexander's Shopping Center in the Bronx" in May 1991, and that Sanchez had stated, in substance, "that he knew that people were talking, ... and that they would be dealt with or that he would deal with them."

This testimony was consistent with prior testimony given by Assistant United States Attorney Christine Gray, who had testified at a detention hearing in this case on July 9, 1991 that Ebanks had reported the May 1991 encounter between her and Sanchez to Gray, and had attributed to Sanchez the statement that: "Whoever is talking, we're going to know who it is, they're going to have to take the witness stand. And when that happens, I'll take care of it." Although Sanchez did not testify at the April 6, 1993 proceeding, he testified at the July 9, 1991 detention hearing, and denied that the encounter described by Ebanks had taken place.

The court concluded that the conversation had occurred, and that "the comments were such as to intimidate; and the substance of the entire conversation leads me to conclude there was a threat, and it was intended to attempt to influence a potential witness. Therefore, ... under the guidelines, an adjustment for obstructing or impeding the administration of justice is appropriate." Accordingly, the court enhanced Sanchez's sentence.

■ Sanchez does not challenge Judge Martin's conclusion that the described conversation between Sanchez and Ebanks occurred, but nonetheless contends that an enhancement was unwarranted. He asserts that "whether these facts relied on by the court constitute 'obstruction of justice' is a question of law subject to *de novo* review."

The only disputed issue presented on this appeal, however, is Sanchez's intent in addressing Ebanks. As we stated in *United States v. Stroud,* 893 F.2d 504 (2d Cir.1990):

> As written, Guidelines § 3C1.1 contains a clear *mens rea* requirement that limits its scope to those who "willfully" obstruct or attempt to obstruct the administration of justice.... [W]e are convinced that the word "willfully," as used in section 3C1.1, requires that the defendant consciously act with the *purpose* of obstructing justice.

*Id.* at 507; *see also United States v. Rivera,* 971 F.2d 876, 894 (2d Cir.1992); *United*

*States v. Altman,* 901 F.2d 1161, 1164 (2d Cir.1990).

We review Judge Martin's determination that Sanchez acted with the intent to intimidate Ebanks and obstruct justice for clear error. *See United States v. Shoulberg,* 895 F.2d 882, 884 (2d Cir.1990) ("the sentencing court's findings as to what acts were performed, what was said, *what the speaker meant by his words,* and how a listener would reasonably interpret those words will be upheld unless they are clearly erroneous") (emphasis added) (citing *Stroud,* 893 F.2d at 506–07). We certainly perceive no basis to find clear error on this record.

Sanchez also argues that at the time of the May 1991 conversation, Sanchez did not know that Ebanks was cooperating with the government. Even if this is so, Sanchez was certainly aware that Ebanks was at least a potential witness against him. A threat to a potential witness warrants a § 3C1.1 enhancement for obstruction of justice. *See Altman,* 901 F.2d at 1164 (contacting two victims and other potential witnesses constituted attempted obstruction of justice); *see also United States v. Hernandez,* 967 F.2d 456, 459 (10th Cir.1992); *United States v. Cherif,* 943 F.2d 692, 703 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992).

### Conclusion

The judgment of the district court is affirmed.