**Carl E. CHAMBERLAIN, Petitioner,**

v.

**Dominic MANTELLO, Superintendent Coxsackie Correctional Facility, Respondent.**

No. 95–CV–1050.

United States District Court, N.D. New York.

Jan. 6, 1997.

---

5. Once again, this dismissal applies to plaintiff's claims under both Title VII and the HRL. *See*  *supra,* note 3.

J. Scott Porter, Syracuse, NY, for Petitioner.

Dennis C. Vacco, Attorney General of the State of New York, (Steven H. Schwartz, Asst. Atty. Gen., of counsel), Albany, NY, for Respondent.

## MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

### I. Introduction

On August 1, 1995, petitioner, Carl E. Chamberlain, filed a petition for a writ of habeas corpus challenging the constitutionality of his state court convictions and his subsequent incarceration pursuant to 28 U.S.C. § 2254. Petitioner is presently serving a sentence of 25 years to life for a conviction of murder in the second degree.

This matter had been referred to Magistrate Judge David N. Hurd for a Report–Recommendation ("Report") pursuant to Local Rule 72.3(c) and 28 U.S.C. § 636.[1] Magistrate Judge Hurd filed his Report on September 11, 1996. After being granted an extension of time to file objections, respondent filed his objections to the Report on October 11, 1996. The matter is now before this Court for the adoption or rejection of the magistrate judge's recommendation.[2]

### II. Background

#### A. Events of May 4–5, 1989

Petitioner's convictions stem from a May 5, 1989 hit and run automobile accident which caused the death of Klara Siflis. Ms. Siflis had been riding her bicycle on Route 13 in the Town of Dryden when she was killed. Her body, along with her twisted bicycle and personal possessions were found at 8:30 a.m. that day along the side of the road by a utility crew. (T.Tr. 2606–11). The utility crew called for the police and medical personnel to respond. (T.Tr. 2610). The New York State Police promptly arrived and commenced their investigation. (T.Tr. 2630).

In the early evening of May 4, 1989, a beer party had commenced at the Hopkins home in Cortland. (H.Tr. 49, T.Tr. 1143). The home was owned by petitioner's aunt. (H.Tr. 49). By 6:00 p.m., George Walker, Don Hooper and Ron Libbey were present. (T.Tr. 1143). Also present were several members of the Hopkins family and Don Hooper's brother, Dave. (T.Tr. 1143). At 10:00 p.m., petitioner arrived at the party. (T.Tr. 1144). He had driven to the party in his father's car, a 1972 Dodge Coronet.[3] (T.Tr. 1146, H.Tr. 50). At approximately 1:00 a.m. on May 5, 1989, petitioner drove away from the Hopkins home with Walker, Libbey, Hooper, Jamie Hopkins and Jessie Hopkins in his car. (T.Tr. 1150, H.Tr. 52). Jamie and Jessie Hopkins were dropped off shortly after leaving the Hopkins home while the group drove around Cortland. (T.Tr. 1151). Before leaving Cortland, the group stopped at a convenience store where Walker stole a case of beer. (T.Tr. 1151). Petitioner and his three companions continued driving around drinking beer as they went when it was then decided that they would leave Cortland and drive in the direction of Ithaca. (T.Tr. 1152, H.Tr. 54). Petitioner has testified that he stopped the car in the Town of Dryden and let Walker take over the driving. (H.Tr. 54). Walker denies driving the vehicle at any time while the group was driving between Cortland and Ithaca. (T.Tr. 1154–55). The party

---

**1.** By order dated December 20, 1995, Magistrate Judge Hurd set down this matter for an evidentiary hearing. Respondent appealed this order. By Memorandum–Decision and Order dated March 12, 1996, Judge Con. G. Cholakis affirmed Magistrate Judge Hurd's order. By order dated March 29, 1996, Magistrate Judge Hurd denied the respondent's application to have the Tompkins County District Attorney serve as respondent's counsel at the evidentiary hearing. This order was also appealed and by Memorandum Decision and Order dated May 22, 1996, respondent's appeal was denied and dismissed and the matter was recommitted to Magistrate Judge Hurd. The evidentiary hearing commenced on June 24, 1996 and concluded the following day.

**2.** Respondent had also filed a "motion for summary judgment" on June 10, 1996. The Report does not specifically address that application. The rules governing habeas corpus applications do not contemplate a motion for summary judgment as a submission by a respondent. *See* Rule 5, Rules Governing Section 2254 Cases in the United States District Courts.

**3.** The vehicle is hereinafter referred to as "petitioner's automobile."

arrived in Ithaca and after spending some time at the Pyramid Mall, left for Cortland. (T.Tr. 1153). At this point, Walker testified that he was seated in the backseat next to Libbey and that Hooper was in the front seat next to the petitioner, who was driving. (T.Tr. 1155). Petitioner maintains that Walker was behind the wheel when they departed Ithaca. (H.Tr. 54–56). While driving on Route 13 en route to Cortland, the vehicle was turned around and began traveling again in the direction of Ithaca. (H.Tr. 56, T.Tr. 1155, 1522). According to Hooper and Walker, petitioner decided to turn the vehicle around for the purpose of pursuing a woman riding a bicycle in the direction of Ithaca. (T.Tr. 1156, 1520). According to petitioner's testimony, he asked Walker to turn the car around so that they could get some gas because the car was low on fuel. (H.Tr. 56). The car was involved in a collision. (T.Tr. 1155, H.Tr. 56). Walker and Hooper testified that the car swerved to the right and struck a woman on a bicycle, smashing the windshield of the car. (T.Tr. 1155, 1521–32). Petitioner testified that the car hit something on Route 13, but that he did not see what had been hit. (H.Tr. 56). After the collision, it is petitioner's testimony that he instructed Walker to stop the car so that he could change places with him and drive the car home. (H.Tr. 56–57). All occupants in the car, except Libbey, are in agreement that the car was turned around after the collision and then proceeded in the direction of Cortland.[4] (H.Tr. 58, T.Tr. 1161, 1520).

As the car proceeded down Route 13 toward Cortland after the collision, the petitioner was at the wheel. (H.Tr. 58). The four did not get far before Trooper Standinger of the New York State Police pulled over the vehicle. (H.Tr. 59, T.Tr. 1908–13). At the moment the vehicle was pulled over, petitioner was behind the wheel, Hooper was next to him in the front seat and Walker and Libbey were in the back seats. (T.Tr. 1919, H.Tr. 57). The windshield had been smashed. (T.Tr. 1956). When told to step out of the vehicle at Standinger's command, small pieces of broken windshield glass fell

off Hooper. (T.Tr. 1950, 2186). Upon questioning, petitioner told Trooper Standinger that the windshield had been broken during a fight in Ithaca. (H.Tr. 59, T.Tr. 1915). Standinger saw beer cans strewn throughout the car, detected the smell of alcohol, and also noticed that petitioner's eyes were glassy. (T.Tr. 1920–39, 1954, 2151). Standinger decided to put petitioner through some field sobriety tests, which he failed. (T.Tr. 1939). Petitioner was then arrested for driving while intoxicated and taken to the State Police barracks by Standinger. (T.Tr. 1939. 1966).

When the petitioner arrived at the barracks, Walker, Hooper and Libbey were already there, having walked over from where the vehicle had been stopped. (T.Tr. 1957, 1967). Petitioner was then given a breathalyzer test by another trooper, which he also failed. (T.Tr. 1978, 2464). Petitioner remained in custody but Walker was given the keys to petitioner's car and was instructed to drive the car back to Cortland with Hooper and Libbey. (T.Tr. 1989).

Ultimately, petitioner was charged with driving while intoxicated and, later on May 5, 1989, petitioner was charged with murder in the second degree for the death of Klara Siflis. (H.Tr. 60–61).

## B. State Court Proceedings

On May 10, 1989, petitioner was charged by a Tompkins County Grand Jury in a six count indictment for: (I) murder in the second degree in violation of § 125.25(1) of the Penal Law of the State of New York; (II) murder in the second degree in violation of § 125.25(2) of the Penal Law of the State of New York; (III) vehicular manslaughter in the second degree in violation of § 125.12 of the Penal Law of the State of New York; (IV) driving while intoxicated in violation of § 1192(2) of the Vehicle and Traffic Law of the State of New York; (V) driving while intoxicated in violation of § 1192(3) of the Vehicle and Traffic Law of the State of New York; and (VI) leaving the scene of an accident without reporting in violation of

---

4. Throughout these events, Libbey was apparently asleep in the back seat of the vehicle and claims to have no recollection of the collision. (T.Tr. 989–90).

§ 600(2)(a) of the Vehicle and Traffic Law of the State of New York. Petitioner plead not guilty to all charges.

After a lengthy trial in which the jury heard from 32 witnesses, petitioner was convicted on October 13, 1989 of murder in the second degree (depraved indifference to human life)[5] and leaving the scene of an accident.[6] The jury was charged as to all counts in the indictment with the exception of the driving while intoxicated counts. Petitioner was sentenced to a term of imprisonment of 25 years to life for the murder conviction. Petitioner was also sentenced to a concurrent one-year term of imprisonment, for his conviction on the charge of leaving the scene of an accident.

Petitioner appealed his conviction to the Appellate Division, Third Department. The conviction was affirmed on December 26, 1991. *See People v. Chamberlain*, 178 A.D.2d 783, 578 N.Y.S.2d 270 (3d Dept.1991). The New York State Court of Appeals denied petitioner's motion for leave to appeal on March 3, 1992. *See People v. Chamberlain*, 79 N.Y.2d 945, 583 N.Y.S.2d 199, 592 N.E.2d 807 (1992). Subsequently, in Tompkins County Court, petitioner made an application to vacate his conviction pursuant to § 440.10 of the New York State Criminal Procedure Law. In that application, petitioner raised two claims. First, petitioner asserted that he had "newly discovered evidence" in the form of affidavits from four individuals who claim that Walker admitted to them that he had been driving at the time of the collision. Second, petitioner asserted that Troopers David Harding ("Harding") and Robert Lishansky ("Lishansky"), who both testified at petitioner's trial, were re-

sponsible for tampering with the evidence in his case. The Tompkins County Court found both of these claims to be without merit and denied the application on October 25, 1993. *See People v. Chamberlain*, No. 89–67 (Tompkins Co. Ct., filed October 25, 1993). Petitioner's motion for leave to appeal this order was denied by the Appellate Division on December 14, 1993.

### C. Trooper Lishansky's Testimony at Petitioner's Trial

During 1989 Robert Lishansky was a Trooper assigned to the Identification Section of Troop C of the New York State Police. (T.Tr. 3054). At the trial, he described his responsibilities which included the processing of evidence, the photographing of crime scenes, the examination of fingerprints and reconstructing accidents. (T.Tr. 3056).

On May 5, 1989, Lishansky arrived at the crime scene between 11:00 and 11:30 a.m. on that day. (T.Tr. 3055). Upon arrival he was met by State Police Investigator Stark and Sergeant Bachner. (T.Tr. 3062). Lishansky began his work by walking around the crime scene to search for physical evidence. (T.Tr. 3063). He testified that he found pieces of plastic that were from the grille of an automobile at the scene. (T.Tr. 3064). It was his testimony that before each piece of plastic was picked up, it was photographed and measured where it was found. (T.Tr. 3065). Also found at the scene were the victim's body, the victim's personal effects and clothing, the bicycle, pieces of the bicycle and its

---

5. Under § 125.25(2) of the Penal Law, "[a] person is guilty of murder in the second degree when ... [u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person." N.Y. Penal L. § 125.25(2) (McKinney's 1987).

6. Under § 600(2)(a) of the Vehicle and Traffic Law, "any person operating a motor vehicle who, knowing or having cause to know that personal injury has been caused to another person, due to an incident involving the motor vehicle operated by such person shall, before leaving the place where the said personal injury occurred, stop, exhibit his license and insurance

identification card for such vehicle, when such card is required pursuant to article six and eight of this chapter, and give his name, residence, including street and street number, insurance carrier and insurance identification information including but not limited to the number and effective dates of said individual's insurance policy and license number, to the injured party, if practical, and also to a police officer, or in the event that no police officer is in the vicinity of the place of said injury, then, he shall report said incident as soon as physically able to the nearest police station or judicial officer." N.Y. Veh. & Traf.L. § 600(2)(a) (McKinney's Supp.1996).

**504**

components, and pieces of bondo[7] from the vehicle. (T.Tr. 3069).

Lishansky testified that he placed the pieces of bondo in an evidence envelope, tagged it, and turned the envelope over to his colleague, Trooper Harding, when Harding arrived on scene. (T.Tr. 3074). Lishansky followed the same procedure with respect to several other items of evidence at the scene including pieces of the bicycle, a watch cover, a red reflector, a bicycle brake pad, a fur hat, two black gloves, and a blue duffel bag (T.Tr. 3072, 3081, 3084, 3088–92). Lishansky transported the victim's bicycle to the Ithaca State Police garage himself. (T.Tr. 3093).

Later on May 5, 1989, Lishansky took some photographs of petitioner's vehicle at the Ithaca station. (T.Tr. 3120). At that time he noticed that some of the plastic grille work on the vehicle was missing. (T.Tr. 3120). While at the station, Lishansky, together with the assistance of another State Police officer, Investigator Stark, disassembled the headlight casing of petitioner's vehicle to ascertain if the plastic pieces of automobile grille he found at the scene fit in the places where the grille work was missing. (T.Tr. 3121–27). Lishansky testified that these pieces of grille work fit the plastic grille on petitioner's car perfectly. (T.Tr. 3127).

Lishansky's testimony regarding the broken grille on petitioner's automobile was not the only way he connected the car to the crime scene. He testified that, upon inspection, he found that there was red paint on the bumper of petitioner's vehicle. (T.Tr. 3120). Lishansky testified that he had also found that red paint had been scraped off the victim's bicycle. (T.Tr. 3132). He also compared the indentations on the bicycle caused by the impact and he found that these matched an indention on petitioner's car. (T.Tr. 3133–38). Finally, with Investigator Stark's assistance, Lishansky also ascertained that the pieces of bondo found at the crime scene fit into places on the front passenger door where bondo had been applied but was now missing. (T.Tr. 3141).

From the measurements Lishansky took with respect to the evidence he found at the scene, he developed a scale drawing of the crime scene which indicated where the various pieces of physical evidence were found. (T.Tr. 3098–3103). The drawing expressly indicated the location of where the pieces of plastic automobile grille and bondo were found. (T.Tr. 3106, 3109).

Testifying as to his reconstruction of the accident, Lishansky opined that the victim was hit directly from behind, as indicated by the path of the items of evidence which were found in a straight line from the point of impact, with a slight angulation between the car and the bicycle. (T.Tr. 3116, 3388). The collision was not a glancing blow, according to Lishansky. (T.Tr. 3116–17). He also determined that the vehicle that had struck the victim was not braking at the time of impact. (T.Tr. 3166).

## D. Trooper Harding's Testimony at Petitioner's Trial

Trooper David L. Harding was a Unit Supervisor for the Forensic Unit from Troop C of the State Police in 1989. (T.Tr. 2278). He arrived at the scene of the accident on May 5, 1989 at approximately 12:00 p.m. (T.Tr. 2279). He was immediately met by one his colleagues, Trooper Lishansky. (T.Tr. 2279). Harding then began to investigate the scene. (T.Tr. 2278). Upon his examination of the body of the victim, it was his testimony that he found a piece of what he believed to be bondo in the hair of the victim. (T.Tr. 2279). Trooper Lishansky told him that there was a vehicle down at the State Police barracks that may have been involved in the accident. (T.Tr. 2782).[8] Harding then proceeded to the barracks and took some photographs of the vehicle. (T.Tr. 2783). After taking his photographs, he returned to the scene to inform Lishansky that body

---

7. Throughout the trial, the term "bondo" was used as a generic description for the plastic resin that is used in automobile repairs to fill in dents in the body of an automobile. (T.Tr. 2779, 3072–73).

8. Petitioner's car had been located earlier in the morning by Troopers Standinger and O'Connell who had it towed to the Ithaca State Police barracks. (T.Tr. 2012–14).

work had been done on the car at the barracks. (T.Tr. 2786).

Throughout the day, Harding worked with Lishansky in the collection of physical evidence from the scene. (T.Tr. 2788–2831). It was Harding's duty to take several items of evidence, including those items given to him by Lishansky, and transport them first to the barracks evidence locker and ultimately to the State Police laboratory in Port Crane, New York. (T.Tr. 2800, 2805). These items included the bondo found in the victim's hair, other pieces of bondo found at the scene, pieces of automobile plastic, a hub cover, and a bicycle brake pad. (T.Tr. 2800–15). Harding also secured a bondo "control sample" from the petitioner's car to be used by the State Police laboratory. (T.Tr. 2819).

### E. Special Prosecutor Nelson Roth Interviews Trooper Harding

Almost four years later, on March 10, 1993, Special Prosecutor Nelson Roth interviewed Harding pursuant to an ongoing investigation of evidence tampering in criminal cases by members of Troop C of the New York State Police. (H.Tr. 29). In that interview, Harding admitted that his testimony regarding the bondo he had found at the accident scene was false since he had actually removed that bondo from the petitioner's car when it was impounded at the State Police barracks. (Pet'r Ex. 2). He also stated that Lishansky had planted a piece of the headlight assembly from the petitioner's car at the scene of the accident. (Pet'r Ex. 2).

### F. George Walker's Statements Regarding the Crime

During 1992, petitioner obtained affidavits from four individuals who claim that Walker had admitted to them that he and not petitioner had been driving petitioner's vehicle when Klara Siflis was killed.

Thomas Parsley, one of petitioner's fellow inmates, stated in his affidavit that he and Walker were housed together in the Cayuga Correctional Facility's Special Housing Unit. At that time, Walker is claimed to have admitted that he was the driver and that one of his friends made up a story to blame the incident on petitioner.

Theresa Chamberlain, petitioner's sister-in-law, stated that she had traveled to New York City with Walker in June of 1990. She further stated that Walker, on two occasions, admitted to her that he was the individual responsible for the death for which petitioner was convicted.

Linda Miller, petitioner's aunt, stated that Walker admitted to her on May 5, 1989 that he was the driver of the vehicle at the time of the collision. Upon hearing that admission, she told Walker that she was taking him to the State Police barracks. According to her affidavit, Walker departed before she could bring him to the barracks. Ms. Miller stated that she went to the barracks alone, but that the police did not want to listen to her.

Julie Crandall stated that she met Walker in August, 1990 and that he told her he had been the driver who hit the bicyclist in Ithaca, New York.

### III. The Evidentiary Hearing

### A. Trooper Lishansky

Lishansky was called by the respondent. He acknowledged that he was the individual in charge of reconstructing the accident for the State Police. (H.Tr. 196). As Lishansky understood it, his purpose at petitioner's trial was to provide a link between the victim, the bicycle and petitioner's vehicle. (H.Tr. 191). He denied that he knew that Harding had placed bondo in the hair of the victim. (H.Tr. 186, 195). He further denied instructing Harding to place parts of the car at the scene. (H.Tr. 187).

### B. Trooper Harding

Upon questioning by petitioner's counsel, Harding again admitted that he had placed bondo from petitioner's car in the hair of the victim. (H.Tr. 22). Harding explained that the reason this was done was to tie the vehicle to the scene of the crime. (H.Tr. 23). He believed that Lishansky was present when the bondo was placed on the victim. (H.Tr. 23). Harding further testified that he was aware of Lishansky planting a piece of the headlight assembly of the car at the

scene and that the two had discussed it. (H.Tr. 34–35).

### C. Linda Miller

Linda Miller was called to testify by the petitioner. She testified in a manner consistent with the statements she had previously made in her affidavit regarding Walker's May 5, 1989 admission that he had been the driver. (H.Tr. 43). Additionally, Miller testified that the State Trooper that she attempted to tell her story to was Trooper Harding. (H.Tr. 44). She testified that she was told that her statement was of no use because she was the petitioner's aunt. (H.Tr. 44).

### D. Thomas Parsley

Thomas Parsley was called by petitioner and testified in a manner generally consistent with his prior affidavits. One discrepancy is apparent, however. In his affidavits he stated that he was incarcerated with Walker at Cayuga Correctional facility. At the hearing, he testified that he and Walker were both inmates of Washington Correctional Facility. (H.Tr. 78). Parsley testified that Walker told him that he was driving at the time of the incident and that petitioner took over the driving after the incident. (H.Tr. 83). Parsley was questioned about how he came to know the petitioner. (H.Tr. 81). Parsley recalled meeting him at the law library of Coxsackie Correctional Facility when the subject of the fatal accident came up as a matter of coincidence during conversation. (H.Tr. 81).

A number of other witnesses were also called to testify at the evidentiary hearing. Petitioner, who had not testified at the trial, testified on his own behalf.[9] Walker testified in a manner consistent with his trial testimony when called by respondent.[10] Respondent also called State Police Investigator Stark who was at the crime scene on May 5, 1989 with Lishansky and Harding. His testimony supports the respondent's contention that the vast majority of the physical evidence and testimony introduced in the petitioner's crim-

inal trial was untainted. Finally, former Tompkins County Assistant District Attorney James Church, the prosecutor who handled petitioner's criminal prosecution, was called by respondent as a witness. He testified that at no time during the prosecution of petitioner did he have knowledge of evidence tampering by Harding and Lishansky. (H.Tr. 158).

After the conclusion of the hearing and after reviewing the entire trial transcript and the exhibits, Magistrate Judge Hurd recommended that the petition be granted and that the petitioner be released from state custody if not afforded a new trial within 60 days. Report at 25.

### IV. Discussion

The respondent has filed objections to the Report and the Court accordingly subjects this matter to a de novo review. 28 U.S.C. § 636(b)(1).

### A. Retroactivity of the Amendment to 28 U.S.C. § 2254

■ For his first objection, respondent contends that the magistrate judge erred by not applying the Antiterrorism and Effective Death Penalty Act of 1996, P.L. 104–132, which was signed into law on April 24, 1996. Specifically, respondent cites the following provisions from § 104 of the statute (amending 28 U.S.C. § 2254(e)(2)) to support his argument that petitioner was never entitled to an evidentiary hearing under the facts alleged:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

---

**9.** The substance of petitioner's testimony is set forth in section II(A), *infra.*

**10.** The substance of Walker's testimony is set forth in section II(A), *infra.*

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty for the underlying offense.

Section 104 of the statute amended other substantive provisions of 28 U.S.C. § 2254 as well. The Second Circuit recently addressed the issue of the retroactive application of § 104 of the new statute in *Boria v. Keane*, 90 F.3d 36 (2d Cir.1996). In *Boria*, the Court held that § 104 of the statute, being silent as to its retroactive effect, should not be applied retroactively. *Id.* at 38. Accordingly, the magistrate judge was correct in his determination that the statute applicable to this case is 28 U.S.C. § 2254 prior to its amendment. To the extent that respondent argues that petitioner was not entitled to an evidentiary hearing under the old habeas statute, this issue was disposed of by Judge Cholakis' March 12, 1996 order.

The balance of the respondent's objections are by and large a challenge to the propriety of the findings made by the magistrate judge with respect to the factual record. Respondent contends that the magistrate judge ignored some testimony, overemphasized the importance of other testimony, and drew several improper inferences from the evidence. These issues are subsumed within the essential question for the Court raised by the petition: does the evidence of prosecution witness perjury require habeas relief? Respondent's particular objections will thus be taken up as each bears on the disposition of this question.

### B. Standard of Review

■ At the outset, the Court is in agreement with the magistrate judge that petitioner has exhausted his remedies prior to seeking federal habeas relief. "A federal court may not grant a writ of habeas corpus to a state prisoner 'unless it appears that applicant had exhausted the remedies available in the courts of the State ...'" *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994) (quoting 28 U.S.C. § 2254(b)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995). Here, the petitioner has appealed his conviction to the Appellate Division; he has sought leave to appeal his conviction to the New York State Court of Appeals; he has moved to vacate his conviction; and he has sought leave to appeal the denial of that motion.

■ When a federal habeas petitioner premises his claim upon newly discovered evidence alleged to be material to his state conviction, he must still demonstrate an independent constitutional violation occurred during the underlying criminal proceedings. *Herrera v. Collins*, 506 U.S. 390, 399–401, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993). A showing that perjured testimony was introduced at trial, without more, does not establish a violation of due process and does not warrant habeas relief. *Sanders v. Sullivan*, 863 F.2d 218, 222 (2d Cir.1988) ("*Sanders I*"). "[I]t is indeed another matter when a credible recantation of the testimony in question would most likely change the outcome of the trial and a state leaves the conviction in place." *Id.* Before relief is warranted, the perjured testimony must be shown to be "material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481 (1985).

■ With respect to this question of materiality, two distinct standards of review exist. "Where the prosecution knew or should of known of the perjury," the conviction must be set aside "'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991) (quoting *Perkins v. Le Fevre*, 691 F.2d 616, 619 (2d Cir.1982) (citations omitted)). "When a government witness falsely testifies and the prosecutor was unaware of the perjury, a new trial will only be warranted "if the testimony is material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Id.* (quoting *Sanders I*, 863 F.2d at 226) (alteration in *Wallach*) (citations omitted).

Relying on *United States v. Rosner*, 516 F.2d 269 (2d Cir.1975), *cert. denied,* 427 U.S.

911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976), the magistrate judge took the analysis one step further by holding that "[w]here a state witness such as a police officer participates in the strategy of the investigation and prosecutorial preparation of the case, that witness is a part of the prosecution and his knowing perjury is imputed to the prosecution." Report at 17. *Rosner* involved the perjury of Robert Leuci, a corrupt undercover police officer, who falsely testified regarding collateral matters that affected his credibility but did not directly involve the guilt or innocence of the defendant. *Id.* at 279–80. The Second Circuit noted that Leuci was not "an ordinary witness" but the Court nevertheless did not impute his misconduct to the prosecution and applied the standard of review applicable to perjury by government witnesses generally. *Id.* at 280–81. In explaining its rationale for its holding, the Court noted that Leuci's perjury concerned collateral matters and that "Leuci was an investigative informant rather than an investigator with authority to arrest in that status, or to direct investigation [and] *that the government could not have known his secret past ...*" *Id.* at 280 (emphasis supplied). The Second Circuit has never held that knowledge of perjurious testimony by an investigating police officer can or should be imputed to the prosecution when there is no way that the prosecution could have known of the perjury. *See United States v. Sanchez,* 813 F.Supp. 241, 246 (S.D.N.Y.1993), *aff'd,* 35 F.3d 673 (2d Cir. 1990). As Judge Lasker observed in *Bell v. Coughlin,* 820 F.Supp. 780, 789 n. 6 (S.D.N.Y. 1993), although the Second Circuit's position on this issue is unclear, "its analysis in cases such as *United States v. Sanchez,* 969 F.2d 1409, 1414–15 (2d Cir.1992), which involve the use of perjured testimony by law enforcement officials, suggests that it may not recognize this principle." *Bell,* 820 F.Supp. at 789 n. 6. More recently, in *United States v. Moore,* 54 F.3d 92, 99 (2d Cir.1995), the Second Circuit was presented with another case involving the alleged perjury of police officers and stated that the petitioner's burden was as previously stated in *Sanchez,* the petitioner had to demonstrate that the witness committed perjury and "that the jury probably would have acquitted in the absence of the false testimony." *Moore,* 54 F.3d at 99 (quoting *Sanchez,* at 1413–14).

■ In the present case, there is no question that the Tompkins County District Attorney had no knowledge of the perjury that has been brought to light by the petitioner's application. (H.Tr. 158). Nor does the record suggest that there was any way that the prosecution could have known of the activities of Troopers Harding and Lishansky. In view of the Second Circuit's adherence to the aforementioned standards of review regarding perjury by a government witness, the Court concludes that knowledge of the perjury of the prosecution's witnesses in this case cannot be imputed to the Tompkins County District Attorney, contrary to the conclusion of the magistrate judge. *Wallach,* 935 F.2d at 456; Report at 17.

Petitioner's burden is thus a heavy one. He must show that but for the alleged perjury of Harding, Lishansky and Walker, he would not have been convicted by the jury of the charge of murder in the second degree. The analysis of this question requires that the Court first determine whether evidence of perjury in petitioner's trial has been adduced in these proceedings. *United States v. White,* 972 F.2d 16, 20 (2d Cir.), *cert. denied,* 506 U.S. 1026, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992). Second, the Court must determine the materiality of that perjurious testimony with respect to the jury's finding of petitioner's guilt. *Sanchez,* 969 F.2d at 1413–14.

## C. Evidence of Perjury

### 1. Troopers Harding and Lishansky

■ Initially, respondent suggests, but does not seriously argue, that the evidence of Harding and Lishansky's perjury does not constitute "new evidence." Of course, a habeas petitioner must demonstrate that the alleged newly discovered evidence supporting his claim "could not with due diligence have been discovered before or during the trial." *White,* 972 F.2d at 20 (citations omitted). Here, it is quite apparent that at the time of petitioner's state trial, neither the defense nor prosecution or, for that matter, the court, had any reason to doubt that Harding and Lishansky were fulfilling their duty in accor-

dance with the law. It was not until the misdeeds of these two men were uncovered in the investigation conducted under Special Prosecutor Nelson Roth in 1993 that doubt was cast upon their testimony in petitioner's case. Therefore, the evidence adduced by petitioner to support his allegation that Harding and Lishansky committed perjury is new evidence and is properly considered during the collateral review afforded by this proceeding. *Sanders v. Sullivan,* 900 F.2d 601, 605 (2d Cir.1990) (*"Sanders II"*).

Turning first to Harding's alleged perjury, petitioner has demonstrated that this prosecution witness tampered with the evidence when he planted bondo from petitioner's automobile in the victim's hair and further that he committed perjury during the state trial when he testified that he found this bondo in the victim's hair at the crime scene. This was established through Harding's recantation of his testimony and his admission of evidence tampering before Special Prosecutor Roth and before Magistrate Judge Hurd at the evidentiary hearing.

■ Respondent has lodged an objection with respect to the magistrate judge's finding that Lishansky tampered with the evidence and committed perjury at the trial when he testified that he found plastic pieces from the grille of petitioner's automobile at the crime scene. Respondent asserts that petitioner has not established evidence tampering or perjury on the part of Lishansky. To be sure, Lishansky has denied knowledge of any evidence tampering in petitioner's case. Lishansky has also never recanted any of the testimony he gave at petitioner's trial. Lishansky has, however, been quite clearly implicated by Harding's testimony which is strong evidence that Lishansky participated in planting physical evidence, namely, pieces of automobile plastic from the grille of petitioner's car, at the crime scene. The magistrate judge also found Lishansky's denial that he knew of any evidence tampering lacked credibility. Report at 14. Furthermore, as the magistrate judge noted, Lishansky has not

been forthright in revealing all of the information in his possession to investigators. Report at 12–13.[11] In view of the foregoing, respondent's objection is not well founded and the Court concurs with the finding of Magistrate Judge Hurd that petitioner has established that Lishansky both committed perjury and tampered with the evidence with respect to the pieces of automobile plastic that Lishansky testified were found at the crime scene.

Respondent also objects to the way the magistrate judge characterized two additional areas of Lishansky's testimony. According to respondent, the magistrate judge "over-emphasized" the character and significance of Lishansky's testimony regarding (1) the angle of impact between the automobile and the victim's bicycle and; (2) the fact that the automobile did not brake prior to the time of impact. Respondent's objections at 17–19. Respondent further contends that the magistrate judge improperly concluded that Lishansky's testimony that the vehicle did not brake prior to impact was perjury.

Contrary to respondent's contention, the magistrate judge did not find that Lishansky had committed perjury when he testified that the vehicle did not brake prior to impact. Respondent's suggestion to the contrary is therefore erroneous. As to the significance assigned to Lishansky's testimony by the magistrate judge, the trial testimony of Lishansky supports the prosecution's theory that Ms. Siflis was run down intentionally, "from directly behind," without evasive action. (T.Tr. 3389). The magistrate judge's characterization of that testimony was therefore proper in all respects, since Lishansky's testimony did not support the theory that the collision was "consistent with an unintentional blow" as respondent suggests. Respondent's objections at 18.

### 2. The Four Affidavits

Respondent objects to the consideration given to the affidavits of Linda Miller, Thomas Parsley, Theresa Chamberlain and Julie

---

**11.** Lishansky's lack of candor with the special prosecutor investigating allegations of evidence tampering by these individuals has resulted in the imposition of an additional perjury charge

beyond his original plea bargain. Report at 12–13. Neither man has been charged with respect to any events occurring in the petitioner's criminal trial.

Crandall by the magistrate judge. As noted, *ante,* these affidavits all allege conversations involving Walker in which he claims to have been the driver at the moment of impact. Parsley and Miller also testified at the evidentiary hearing. With the exception of Miller, all of the witnesses relate conversations with Walker that occurred after the conclusion of the state criminal proceedings. For various reasons, respondent contends that the affidavits and hearing testimony of these witnesses should not have been credited by the magistrate judge.

Respondent contends that Miller's affidavit and hearing testimony should not have been considered in support of the petition because Walker's recantation to Miller occurred prior to the commencement of the state criminal proceedings. Newly discovered evidence is evidence that could not have been discovered by the petitioner with due diligence. *Moore,* 54 F.3d at 99. Petitioner could have discovered Walker's statement to Miller, his aunt, by simply asking her. The record establishes that petitioner knew or should have known that his aunt had contact with Walker after the occurrence of the incident and while criminal proceedings were being instituted against petitioner. Due diligence required petitioner or his defense counsel to ascertain, in the course of their investigation, if Walker had been making any statements regarding the events of May 5, 1989. The record does not suggest that Miller was interviewed by the defense to ascertain if she had information bearing on petitioner's guilt or innocence. Accordingly, the magistrate judge should have rejected the Miller affidavit and testimony since this information was clearly available to petitioner at the time of his trial, had he sought it out. The magistrate judge's finding that Miller kept quiet until after the trial due to Harding's instruction (that Walker's statement was useless) is not supported by the record.

The affidavits of Parsley, Crandall and Chamberlain and Parsley's testimony at the hearing do constitute new evidence since this information was clearly unavailable at the time of the criminal trial. This evidence would have impeached Walker's credibility at trial with respect to the material issue of who

was the driver at the moment of the collision. Accordingly, this evidence was properly considered by the magistrate judge.

## D. Materiality

In determining the materiality of perjury, the Court's duty is an unusual one since the law requires the Court to divine the path that the jury would have taken but for the false testimony that prevailed in the underlying trial. *See Alvarez v. United States,* 808 F.Supp. 1066, 1089 n. 10 (S.D.N.Y.1992). Indeed, the precise nature of such an undertaking is not readily apparent. Should the Court determine the effect of the perjurious testimony by analyzing the remaining, presumably untainted, evidence in the trial to see if that evidence would have supported the verdict? This is the method urged by the respondent. Respondent would have the Court look upon the record after removing the evidence of perjury and evidence tampering by Harding and Lishansky, much as one can remove two cookies from the jar. Or, should the Court consider the effect of this false evidence upon the jury's verdict, not only for how these pieces of tainted evidence fit within the prosecution's theory of the case but also for how the jury would view these two witnesses who, in their industry, sought to frame the petitioner? This question is disposed of by the Second Circuit's opinion in *United States v. Stofsky,* 527 F.2d 237, 246 (1975).

Noting that a witness's credibility can be "every bit as important as the factual elements of the crime itself," *id.* (citation omitted), the Court instructs that

> [u]pon discovery of previous trial perjury by a government witness, the court should decide whether the jury probably would have altered its verdict if it had the opportunity to appraise the impact of the newly-discovered evidence not only upon the factual elements of the government's case *but also upon the credibility of the government's witness.*

*Id.* (emphasis added); *see also Wallach,* 935 F.2d at 458. Thus, when new evidence of perjury by a prosecution witness is uncovered, the prosecution's case is imperiled in

two respects. First, the prosecution could lose an evidentiary building block that helped construct the case against the defendant. Second, the prosecution could be tarnished by a jury's revelation that one of its witnesses has committed perjury.

### 1. The Affidavits and Hearing Testimony of Parsley, Crandall and Chamberlain

■ The Court turns first to the affidavits of Parsley, Crandall and Chamberlain and Parsley's hearing testimony, which support the petitioner's claim that Walker committed perjury when he denied he was the driver of the vehicle when Klara Siflis was killed. It is clear that this new evidence would have had little effect on the jury had it been presented at trial. Notably, there was other evidence beyond Walker's testimony supporting the prosecution's theory that the petitioner was the driver. Examples of this proof are Hooper's testimony that the petitioner was driving and the fact that petitioner was driving the vehicle shortly after the accident when stopped by Trooper Standinger.

This new evidence, which would have impeached Walker's testimony, was also cumulative of other significant evidence that placed his credibility at issue. The voluminous trial record establishes that the jury was well aware that Walker was not a model citizen. This evidence would certainly not have transformed Walker in the jury's eyes "from paragon to knave." *Wallach,* 935 F.2d at 474 (Altimari, J., concurring).

The jury was also presented with evidence that shortly after May 5, 1989, Walker told another individual, Timothy Silvernail, that he was the driver of the vehicle at the time Klara Siflis was killed. (T.Tr. 3887). Therefore, Walker's reported proclivity to take credit for the crime was also known to the jury.

Finally, Walker has always maintained that he has never told anyone that he was the driver of the vehicle. Thus, even assuming the new evidence was presented at the criminal trial, the jury would still have to decide the question of Walker's veracity, an issue in this case from the moment of indictment. This evidence is thus nothing more than "the sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial," or in this instance, habeas relief. *White,* 972 F.2d at 22 (citation omitted).

Accordingly, the Court concurs with the magistrate judge that this evidence is insufficient to compel habeas relief. However, the Court does not agree with the magistrate judge that these affidavits and testimony "provide additional credible evidence of the fundamental unfairness manifested at [petitioner's] criminal trial." Report at 25. This evidence should not, therefore, have been given any weight in the determination of whether petitioner is entitled to relief.

### 2. The Perjury by Harding and Lishansky

■ A number of the respondent's objections are based upon the premise that there is sufficient other evidence in the record, produced by "clean" law enforcement personnel, that supports the jury's verdict.[12] Indeed, nothing in the record has impugned the credibility of Trooper Standinger, Trooper Genovese, Investigator Stark, Sergeant Bachner and Investigator Mastronardi, all State Police personnel working at the scene of the crime on May 5, 1989 who testified at trial. Nevertheless, when the jury deliberated and considered the evidence and ascertained whether they had a reasonable doubt regarding the petitioner's guilt, they were without a few extremely salient facts.

The jury did not know that Harding, the Supervisor of the Troop C Forensic Unit, would commit perjury and plant evidence in his twisted zeal to firmly link the petitioner's car with the death of Klara Siflis. As Harding brought the physical evidence before the jury, the jurors were free to give his

---

12. Respondent asserts that the link between the petitioner's car and the death of the Klara Siflis was not an issue at trial. Contrary to the respondent's contention, the defense never conceded the issue of whether petitioner's automobile was involved in the collision. The expert witness for the defense did testify that petitioner's vehicle had collided with the bicycle but this testimony was, of course, based upon a review of the physical evidence collected by Lishansky and Harding. (T.Tr. 3600, 3630).

testimony the weight normally accorded to the testimony of a law enforcement officer who appears to be fulfilling his duty. "The credibility of a witness who testifies as to substantive facts is critical in the trial of a case." *White,* 972 F.2d at 20. The present case is no exception to that rule of reason.

Harding's evidence tampering also impairs the testimony of Millard Barnum, an expert witness called by the prosecution who is employed at the State Police Crime Laboratory. (T.Tr. 3444). He testified that the bondo found in the victim's hair by Harding and the "control sample" taken from petitioner's car were "identical." (T.Tr. 3448–49). The jury did not know that this unequivocal testimony was founded upon fraudulent evidence. (T.Tr. 3448).

The jury also did not know that Lishansky, another collector of physical evidence and the prosecution's expert "accident reconstructionist" was implicated in the scheme to frame the petitioner through planted evidence, had planted evidence himself and had given false testimony regarding evidence found at the crime scene. Lishansky's trial testimony was similar to Harding's in that it helped to connect the petitioner's car to the scene in a case built largely on circumstantial evidence. Lishansky, like Harding, was also the source of fraudulent evidence that Millard Barnum relied upon for his testimony tying the petitioner's automobile to the crime scene. (T.Tr. 3446).

That Lishansky's credibility was important to the prosecution's case cannot be understated. The prosecution was seeking to establish that Klara Siflis was run down and killed on purpose. Lishansky's testimony regarding the angle of impact and the lack of braking supported that theory and gave it the imprimatur of science. Lishansky's testimony therefore helped establish that the collision was no accident but was rather the result of reckless conduct undertaken with depraved indifference to the life of Klara Siflis. This was essential proof for a conviction of murder in the second degree rather than the lesser charge of vehicular manslaughter.

## V. Conclusion

Our criminal justice system cannot tolerate perjury and evidence tampering from those whom we trust to enforce the law. Dishonesty by the law enforcement personnel of the state, left uncorrected, is a wellspring of tyranny. To tolerate such an attempt to pervert the truth would tarnish the well deserved reputation of the overwhelming number of police officials who are dedicated to justice. Instead of knowing that they were hearing perjury, the jury was free to place their trust in the testimony of Harding and Lishansky.[13] Had the jury known the true facts, the testimony of these prosecution witnesses would have been a potent source of reasonable doubt. The prosecution's attempt to then obtain a conviction of murder in the second degree would almost certainly have been unsuccessful.

Accordingly, it is the "firm belief" of the Court that the evidence of perjury adduced by the petitioner, had it been known to the jury, would probably have resulted in a different verdict. *Sanders I,* 863 F.2d at 226. It is thus material evidence. That New York State has let this untrue testimony stand has resulted in a denial of the petitioner's right to due process. *Giglio v. United States,* 405 U.S. 150, 155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). His continued incarceration in the absence of a new trial is therefore unconstitutional and he is entitled to relief under 28 U.S.C. § 2254.

For the foregoing reasons, it is

ORDERED that the Report is NOT APPROVED to the extent set forth above and is otherwise APPROVED and ADOPTED; and it is further

ORDERED that the petition is GRANTED and it is further

ORDERED that the respondent release the petitioner from custody unless the State of New York affords him a new trial within

---

**13.** Indeed, our jurisprudence recognizes that jurors can be predisposed to give undue credibility to the testimony of law enforcement personnel. *See United States v. Gelb,* 881 F.2d 1155, 1164 (2d Cir.1989).

60 days from the service of this order; and it is further

ORDERED that respondent's motion for summary judgment is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.